# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 05-2820

BERRELL FREEMAN,

*Plaintiff-Appellant,*

*v.*

GERALD A. BERGE, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 03-C-21-C—**Barbara B. Crabb**, *Chief Judge.*

ARGUED NOVEMBER 7, 2005—DECIDED MARCH 23, 2006

Before POSNER, EASTERBROOK, and WOOD, *Circuit Judges.*

POSNER, *Circuit Judge.* A jury in this suit under 42 U.S.C. § 1983 (denial of federal right under color of state law) found that the defendants, officials at a Wisconsin prison, had inflicted cruel and unusual punishment on inmate Freeman by denying him meals. The jury awarded him $50,000 in compensatory damages, plus punitive damages, incomprehensible in light of the evidence, aggregating $1.2 million. The judge granted judgment as a matter of law for the defendants. Freeman appeals from that judgment, seeking reinstatement of the jury's verdict.

Freeman is serving a 58-year sentence in Wisconsin's maximum-security prison (nicknamed the "Supermax," *Scarver v. Litscher*, 434 F.3d 972 (7th Cir. 2006); see *Jones-El v. Berge*, 374 F.3d 541, 542-43 (7th Cir. 2004)) for a variety of violent crimes. Inmates in the Supermax are fed their three meals a day in their cells. The prison's feeding rule requires that the prisoner stand in the middle of his cell, with the lights on, when the meal is delivered and that he be wearing trousers or gym shorts. If the inmate does not comply with the rule, the meal is not served him. Freeman wanted to eat in his underwear, so on a number of occasions over a two-and-a-half-year period he refused to put on pants or gym shorts and as a result was not served, and because he skipped so many meals he lost 45 pounds. The prison also refused to serve him when he had a sock on his head (which could be used as a weapon, depending on what was in it), when his cell walls were smeared with blood and feces that he refused to clean, and when he was asleep.

His behavior was disgusting. But he argues that denial of food is a cruel and unusual punishment for the violation of a prison rule or norm. It is certainly an unusual form of punishment nowadays, and in cases in which it inflicts serious harm on the prisoner it is also cruel. *Reed v. McBride*, 178 F.3d 849, 853-54 (7th Cir. 1999); *Thompson v. Gibson*, 289 F.3d 1218, 1222 (10th Cir. 2002); see *Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *Sanville v. McCaughtry*, 266 F.3d 724, 733-34 (7th Cir. 2001); *Talib v. Gilley*, 138 F.3d 211, 214 n. 3 (5th Cir. 1998). But there is a difference between using food deprivation as a punishment and establishing a reasonable condition to the receipt of food. Suppose that when a guard delivered a food tray to Freeman, Freeman hurled it at the guard. Freeman would have missed a meal but it would be a consequence not of punishment but of a reasonable condition of being fed—that you not throw back the food in

the server's face. In such a case Freeman would be the author of his deprivation rather than a victim of punishment. *Rodriguez v. Briley*, 403 F.3d 952 (7th Cir. 2005).

The same is true here. The pants requirement may not seem a reasonable condition on receiving food but it is. In the words of the appellees' lawyer in his opening statement to the jury, "There are two primary reasons. Number one, there are a lot of women security officers working in this facility so they are entitled to basic privacy. Secondly, there are security issues. Inmates throw urine, feces, expose themselves, ejaculate, and to prevent that from happening to any security officer, there is a rule that the inmate must be clothed." The pants requirement, violation of which was the major cause of Freeman's missed meals, imposed a condition that he could readily have complied with; he offers no excuse for his noncompliance.

He missed some meals not because of the pants rule but because of the sock on the head, the blood and feces on the wall, or his being asleep. The refusal to serve him in the first of these cases, whether or not authorized or directed by any rule, cannot be thought unreasonable; the sock posed a potential threat to the guards. The possibility of contamination of the food by blood or feces might justify refusal to serve a meal in the second case, but this is not argued. Unless the guards had difficulty waking him or were fearful as to how he might react to being wakened, his being asleep at mealtime would not be a good reason for not feeding him. But Freeman failed to show how many of his missed meals were missed for reasons that cannot be easily related to the refusal to comply with a reasonable condition on the receipt of food, except that he testified that he received only one meal a day for two weeks because he refused to keep his cell clean (at the

end of that time prison employees cleaned it). That depriva-
tion by itself would not in the circumstances of this case rise
to the level of cruel and unusual punishment.

The reason for distinguishing between food deprivation
as a punishment and food deprivation as a consequence of a
refusal to comply with a condition precedent to being fed is
that if as Freeman argues any deprivation of food is an
unconstitutional punishment, a food policy cannot
be enforced, at least against prisoners in Freeman's situ-
ation. When we asked his lawyer what alternative re-
sponse to her client's behavior would have been effective in
getting Freeman to comply with the food policy, all
she could think of was placing him in segregation (but
he already *is* in segregation—that is why he is being
served all his meals in his cell), denying him good-time
credits, or depriving him of commissary and other privi-
leges, such as a television set in his cell. Given the length of
his sentence and what is plainly a propensity for obstreper-
ous behavior, it is unlikely that a denial of good-time credits
will inflict significant disutility on him; and as far as denial
of privileges is concerned, he *has* been denied privileges,
without the denial having deterred him from continuing to
violate the food rule. The logic of his position is that if he
refuses any meal that is not prepared by Charlie Trotter, the
prison must procure his meals from Trotter's cater-
ing service and cast about for some method unrelated
to food of discouraging him from making such demands.
Freeman refuses to take seriously the practical limitations of
prison discipline as a means of maintaining an orderly
environment.

A better argument is that while alternative responses
to Freeman's behavior may have seemed unpromising, food
deprivation turned out not to be very effective either, for it
took more than two years for the deprivation to be effec-

tive—and it is not clear that hunger or the health effects of loss of weight was what motivated Freeman to start eating again. But we are pointed to no alternatives that would have been more efficacious.

It does not follow from anything we have said, however, that a prison can allow a prisoner to starve himself to death, or even starve himself to the point at which he seriously impairs his health, which could happen even if his ending weight was "normal" (imagine a person whose weight falls from 250 to 150 pounds in a couple of months). The prison cannot be forced by such tactics to change an otherwise reasonable rule, *Rodriguez v. Briley*, *supra*, 403 F.3d at 953; *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001); *Talib v. Gilley*, *supra*, 138 F.3d at 216; *In re Caulk*, 480 A.2d 93, 96 (N.H. 1984); *People ex rel. Illinois Dept. of Corrections v. Millard*, 782 N.E.2d 966, 972 (Ill. App. 2003), but at some point it may have to force-feed the prisoner to prevent him from seriously endangering his health.

Two situations can be distinguished. In the first, the prisoner is insane, and his insanity causes him to refuse food; the prison is constitutionally obligated to treat his mental illness, if necessary by force-feeding him. *Sanville v. McCaughtry*, 266 F.3d 724, 733-34 (7th Cir. 2001); *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). In the second situation, the prisoner is perfectly sane, but he either wants to commit suicide (and there *are* rational suicides) or he is prepared to risk death from a hunger strike to make a political point. Free people who are sane have a liberty interest in refusing life-saving medical treatment, *Cruzan v. Director, Missouri Dept. of Health*, 497 U.S. 261, 278-79 (1990); see *Washington v. Glucksberg*, 521 U.S. 702, 722 n. 17 (1997), and likewise in refusing to eat, *Blouin ex rel. Estate of Pouliot v. Spitzer*, 356 F.3d 348, 359 (2d Cir. 2004); *Bouvia v. Superior*

*Court*, 225 Cal. Rptr. 297, 300, 305 (App. 1986); see also *Washington v. Glucksberg*, *supra*, 521 U.S. at 723, a method by which some elderly people commit suicide. Ronald M. Holmes & Stephen T. Holmes, *Suicide: Theory, Practice, and Investigation* 59-60 (2005); Martin Tolchin, "When Long Life Is Too Much: Suicide Rises Among Elderly," *New York Times*, July 19, 1989, p. A1. But either prisoners don't have such an interest, or it is easily overridden. *In re Grand Jury Subpoena John Doe*, 150 F.3d 170, 172 (2d Cir. 1998) (per curiam); *Martinez v. Turner*, 977 F.2d 421, 423 (8th Cir. 1992); *Laurie v. Senecal*, 666 A.2d 806, 809 (R.I. 1995); *In re Caulk*, *supra*, 480 A.2d at 96-97; *State ex rel. White v. Narick*, 292 S.E.2d 54, 58 (W. Va. 1982); *McNabb v. Department of Corrections*, 112 P.3d 592, 594-95 (Wash. App. 2005); *People ex rel. Dept. of Corrections v. Fort*, 815 N.E.2d 1246, 1250-51 (Ill. App. 2004); contra, *Zant v. Prevatte*, 286 S.E.2d 715, 716-17 (Ga. 1982).

The reasons are practical. (No longer does one hear that prisoners must not be allowed to evade punishment by killing themselves and thus "cheating the gallows.") If prisoners were allowed to kill themselves, prisons would find it even more difficult than they do to maintain discipline, because of the effect of a suicide in agitating the prisoners. Prison officials who let prisoners starve themselves to death would also expose themselves to lawsuits by the prisoners' estates. Reckless indifference to the risk of a prisoner's committing suicide is a standard basis for a federal civil rights suit. E.g., *Boncher ex rel. Boncher v. Brown County*, 272 F.3d 484 (7th Cir. 2001). The idea behind liability in such cases is that incarceration can place a person under unusual psychological strain and the jail or prison under a commensurate duty to prevent the prisoner from giving way to the strain. The analysis is applicable when suicide takes the form of starving oneself to death. See

*Laurie v. Senecal*, *supra*, 666 A.2d at 809; *Commonwealth of Pennsylvania, Dept. of Public Welfare v. Kallinger*, 580 A.2d 887, 893 (Commonwealth Ct. 1990).

So at some point in Freeman's meal-skipping the prison doctors would have had a duty and certainly a right to step in and force him to take nourishment. Knowing this, the prison has a policy of requiring a prisoner who has skipped all his meals for three consecutive days to be inspected by employees of the prison's health service to make sure he isn't seriously endangering his health. Twice Freeman did not receive a timely inspection and as a result, on each occasion, went eight days straight without a meal. But there is no indication that his life or health was jeopardized. He lost 45 pounds over 31 months, but since he weighed 195 pounds at the beginning and is only 5 foot 6 inches tall he ended up closer to the normal weight for a person of his height than when he began. Not that that is a complete defense, as we indicated earlier. Because of the irregularity of his eating, he experienced unpleasant symptoms, such as blurred vision. But there is no evidence that the defendants knew that he was endangering his health sufficiently to require drastic intervention. He was visited by nurses who confirmed that he was taking water and checked his appearance through the window of his cell, and he was visited by a doctor as well though at some point he began refusing to see the doctor. No doubt he would have sued the defendants for battery had they ordered him force-fed.

Because to an overwhelming degree Freeman's food deprivation was self-inflicted, even if not 100 percent of it was, and the record contains no evidence that he experienced real suffering, extreme discomfort, or any last-

ing detrimental health consequences, the judgment for the defendants must be, and it is,

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*