In the

# United States Court of Appeals
## for the Seventh Circuit

No. 18-3535

MICHAEL JOHNSON,

*Plaintiff-Appellant,*

*v.*

SUSAN PRENTICE, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 16-C-1244 — **Colin S. Bruce**, *Judge.*

ARGUED JULY 22, 2020 — DECIDED MARCH 31, 2022

Before SYKES, *Chief Judge*, and EASTERBROOK and ROVNER, *Circuit Judges.*

SYKES, *Chief Judge*. Michael Johnson, a former Illinois prisoner, sued prison officials and healthcare providers raising claims under 42 U.S.C. § 1983 for alleged Eighth Amendment violations arising while he was in disciplinary segregation. Johnson entered state custody in 2007. His history of prison misconduct—some of it violent and de-structive—led to his transfer in March 2013 to the Pontiac

Correctional Center to serve a lengthy accumulated term of segregation, more commonly known as solitary confinement.

Johnson suffers from serious mental illness, including depression and bipolar disorder, and he was on crisis watch nine times while he was in segregation. Mental-health professionals employed by Wexford Health Sources, Inc., the prison healthcare provider, regularly monitored his condition and treated him with medication, which was periodically adjusted.

Johnson's misconduct continued while he was in segregation, especially when he refused to take his medication, and many of his violations were serious enough to trigger penalties of 30 to 90 days of no "yard" access—that is, exercise time outside his cell—as a sanction. Johnson alleged in his pro se complaint that the cumulative yard restrictions—about three years in total, some 24 months of it consecutive—violated his Eighth Amendment right to be free from cruel and unusual punishment. He also complained of unsanitary conditions, poor ventilation, and summertime heat in his cell, and excessive noise by other inmates. Finally, he alleged a claim for inadequate mental-health treatment. The district court entered summary judgment for the defendants.

Johnson's case has undergone a major transformation on appeal. Now represented by counsel and supported by two amici, he seeks redress for the prolonged period he spent in solitary confinement from March 2013 until his transfer to a mental-health unit in August 2016. For support he cites academic research on the harmful effects of solitary confinement.

This claim is new on appeal. Johnson never sought relief for the time he spent in solitary confinement; he sued over his loss of yard access, certain unhealthy conditions in his cell, and his mental-health treatment. Not surprisingly, the record is entirely undeveloped on the issue of the physical and psychological effects of prolonged solitary confinement. Claims not raised in the district court are waived. To the very limited extent that Johnson's current arguments track the claims that were raised below, they are foreclosed by the record and circuit precedent. We therefore affirm.

## I. Background

Johnson began serving a sentence in Illinois state prison in February 2007. He was frequently transferred between correctional facilities, partly because of his serious prison misconduct, which includes more than 70 conduct violations from 2008 through August 2016. Almost all were classified as "major" violations. Johnson was often violent, threatening, and destructive. His adjudicated misconduct includes, for example, multiple instances of assaulting correctional officers or other inmates, fighting, intimidation and threats, possession of contraband, damaging property, throwing feces or urine out of his cell or at others, smearing feces on himself or his cell, impairing surveillance, disobeying direct orders, and insolence. In March 2013 he was transferred to Pontiac Correctional Center to serve a lengthy accumulated period of disciplinary segregation resulting from consecutive penalties for multiple conduct violations.

Johnson was classified as a seriously mentally ill inmate and was diagnosed with antisocial personality disorder, depression, bipolar disorder, poor impulse control, panic disorder, anxiety disorder, and excoriation disorder (com-

pulsive scratching). He also has a history of suicide threats or attempts. When he arrived at Pontiac, a psychiatrist employed by Wexford, the prison system's healthcare contractor, reviewed his records, evaluated him, and developed a treatment plan that included several psychotropic medications.

Johnson's misconduct continued while he was in segregation at Pontiac. Between March 2013 and August 2016, the time period at issue here, he accumulated more than three dozen conduct violations, all but one classified as "major." These included assaults on staff and other inmates (repeated spitting and throwing bodily fluids); possession of contraband (including, once, a piece of mirror); disobeying orders; impairing surveillance; and throwing urine or feces out of his cell (among other violations). For this new misconduct, he accrued additional periods of time in disciplinary segregation, which when added to his already-accumulated segregation time meant that Johnson spent almost three and a half years—from March 2013 to August 2016—in solitary confinement. (He was also sanctioned with restrictions on his yard access, which we'll discuss in a moment.)

Johnson never stayed long in any one cell. During his time in segregation, Johnson transferred cells roughly 40 times. His stays typically lasted under 14 days. Some were longer, with eight stays lasting between 15 to 30 days and four stays lasting between 30 to 60 days. Johnson's longest stay in a single cell was 150 days, which happened once. The reasons for the cell transfers varied. Many were routine, some were disciplinary, and some were for medical or other nondisciplinary reasons.

Johnson's pro se complaint alleged Eighth Amendment claims under § 1983 for deprivations that can be grouped into three categories: (1) loss of yard access; (2) poor cell conditions; and (3) inadequate treatment of his mental illness. Because Johnson's case has markedly changed on appeal, he has largely abandoned the claims that were litigated below, so a brief summary of each category will suffice. We add pertinent factual detail drawn from the record at summary judgment, giving Johnson the benefit of reasonable inferences in his favor.

An inmate in segregation is permitted to exercise outside his cell for a few hours each week, either in an outdoor exercise area (in a small secured cage) or in an indoor recreation room. These out-of-cell exercise sessions are referred to as "yard" privileges. Yard privileges may be revoked as punishment for major misconduct, and Johnson incurred many such sanctions. Each of his individual yard restrictions ranged from 30 to 90 days, depending on the severity of his misconduct. But the sheer volume of his violations meant that he was under a yard restriction of some duration from April to July 2013 and then almost continuously from about January 2014 through August 2016, for a cumulative total of about three years. (The prison disciplinary records are not clear about the precise start and end dates for each restriction period.)

While under yard restrictions, an inmate is permitted only one hour of out-of-cell exercise per month. Johnson claimed that this too was often withheld for unknown reasons. He contended that between June 2015 and June 2016 he was not permitted any yard access at all.

Johnson also alleged that he was subjected to certain un-healthy cell conditions. He claimed that his cells were often filthy and at times became overheated when temperatures rose in the summer and air circulation was poor. Inmates in segregation were given a half cup of cleaning solution once a week to clean their cells but that was inadequate, especially when he smeared his cell with excrement (or a prior occu-pant did so). To ameliorate the summertime heat, officers placed an industrial fan at the end of the gallery to increase airflow. They also gave inmates a cup of ice each day. These measures, too, were inadequate. Johnson claimed that the temperature in his cell was as high as 90–100 degrees on an unspecified number of summertime days.

Johnson complained to guards three times in the summer of 2016 about the heat in his cell and was twice relocated in response. Johnson also alleged that noise from other inmates screaming and pounding on their cell doors contributed to the poor conditions in the segregation unit, making it hard to sleep and causing him to suffer headaches and "frayed nerves."

Finally, Johnson challenged the adequacy of his mental-health treatment. From almost the moment of his arrival at Pontiac in March 2013, his compliance with treatment was sporadic, and he vacillated between periods of stability and instability. As noted, he was evaluated when he arrived in segregation, and a treatment plan was put in place. The record reflects that he was regularly monitored by Wexford physicians and other mental-health professionals. Some-times he agreed to meet with them, sometimes not. His medication regimen was adjusted many times, especially when he refused to take his prescribed medication or com-

plained of side effects. From March 2013 to August 2016, Wexford psychiatrists prescribed the following medications at various times as they adjusted his treatment in an effort to achieve better control of his mental illness: Vistaril, Thorazine, Risperdal, Depakote, Lithium, Lamictal, Zoloft, and Cogentin (for side effects). Still, sustained stability was elusive. Johnson was placed on crisis watch nine times because of suicidal thoughts or threats, sometimes for a day or two and sometimes longer. While on crisis watch, a guard checked on him every 15 minutes.

Johnson repeatedly requested a transfer to a mental-health unit, but his treating psychiatrists concluded that it was not warranted. In August 2016 the psychiatrists finally recommended a transfer to a specialized mental-health unit. Johnson attributes the decision to this lawsuit, which he had filed two months earlier. The providers say it was because he achieved a measure of compliance with his treatment plan and was a better candidate for transfer to the specialized unit. Either way, Johnson was transferred to a mental-health unit by the end of that month.

Johnson's suit named numerous corrections officials,[1] Wexford mental-health staff,[2] and Wexford itself as defend-

---

[1] Warden Michael Melvin; Correctional Majors Susan Prentice and Warren Hadsell; Correctional Lieutenants James Boland and John Gasper; Correctional Counselor Kimberly Kelly; Casework Supervisor Terri Kennedy; and Correctional Officers Travis Devries, Eric Myers, and Gerald Henkel.

[2] Mental-health professionals Andrea Moss, Kelly Haag, Linda Duckworth, and Stephen Lanterman; psychiatrist Scott McCormick; Medical Director Andrew Tilden; and physician's assistant Riliwan Ojelade.

ants, and he raised the claims we've just described. At several points during the litigation, he moved for the appointment of pro bono counsel. The district judge denied each motion, reasoning that while Johnson had made a reasonable attempt to obtain counsel, he had not shown that he could not litigate the case himself as required by the framework established in *Pruitt v. Mote*, 503 F.3d 647, 654–55 (7th Cir. 2007) (en banc).

After discovery both sets of defendants—the corrections officials and the Wexford defendants—moved for summary judgment. They supported their motions in the usual way with sworn declarations, deposition testimony, and prison records. At first Johnson did not respond. The judge gave him an additional 30 days to do so. He then filed a timely 18-page, 60-paragraph response but submitted no evidence. At the end of his response, he wrote: "I could not finish."

The judge granted the motions and entered judgment for the defendants. He first addressed Johnson's contentions regarding poor conditions and excessive heat in his cell. The record was unclear about how often and for how long Johnson's cell was excessively hot. The judge reasoned that at most this condition was intermittent (occurring only occasionally in the summer) and would have been brief because Johnson routinely switched cells. The same was true about his complaint of poor ventilation and unsanitary cell conditions. The record did not show the frequency or extent to which Johnson was subjected to these conditions.

The judge next rejected the claim about loss of yard access, citing our decision in *Pearson v. Ramos*, 237 F.3d 881 (7th Cir. 2001), and also noting that the record did not establish that Johnson suffered any adverse health consequences.

We'll return to *Pearson* later. For now, it's enough to say that our decision there establishes that a 90-day denial of yard privileges for serious misconduct by an inmate in segregation is not cruel and unusual punishment, *id.* at 884, nor is it an Eighth Amendment violation to "stack" such penalties unless the inmate's misconduct was so minor as to be "trivial," *id.* at 885.

Finally, the judge addressed the claim of inadequate mental-health treatment and rejected it as unsupported by the record. Undisputed evidence established that the Wexford defendants continuously monitored Johnson's mental-health condition and regularly adjusted his medication as circumstances warranted. The corrections defendants did nothing to interfere with his treatment and were otherwise entitled to defer to the decisions of the mental-health professionals. For these reasons, the judge concluded that although Johnson suffered from objectively serious mental illness, the record did not support an inference that the defendants were deliberately indifferent to his mental-health needs.

## II. Discussion

We review the judge's order granting summary judgment de novo. *Quinn v. Wexford Health Sources, Inc.*, 8 F.4th 557, 565 (7th Cir. 2021). As we've noted, Johnson was unrepresented in the district court, but on appeal he has the assistance of counsel and the support of two amici. The briefing on his side is therefore plentiful and well written. But it dramatically reframes the case.

In the district court, Johnson raised claims concerning his loss of yard access, certain unhealthy conditions in his cell, and the adequacy of his mental-health treatment. In contrast,

his appellate counsel and amici now mount an extensive and sophisticated attack on solitary confinement generally, especially when it is used for prolonged periods of time and for inmates with mental illness. Relying on academic literature, they argue that solitary confinement causes psychological and physical injuries that can last for decades after release. Indeed, they question whether *any* use of solitary confinement is compatible with the Eighth Amendment. In short, almost the entire opening brief—48 of its 55 pages— recasts Johnson's case as a claim for the three and a half years that he was held in solitary confinement, with special emphasis on his mental illness.

Whatever its potential merit, this claim was not raised in the district court. It is therefore waived. *Mahran v. Advoc. Christ Med. Ctr.*, 12 F.4th 708, 713 (7th Cir. 2021). As we recently explained:

> "Failing to bring an argument to the district court means that you waive that argument on appeal." *Wheeler v. Hronopoulos*, 891 F.3d 1072, 1073 (7th Cir. 2018). A party must present the specific argument urged on appeal and cannot rest on having addressed the same general issue. *Puffer v. Allstate Ins. Co.*, 675 F.3d. 709, 718 (7th Cir. 2021); *Fednav Int'l Ltd. v. Cont'l Ins. Co.*, 624 F.3d 834, 841 (7th Cir. 2010). Although the argument need not be present in all its particulars and a party may elaborate in its appellate briefs, *Lawson v. Sun Microsystems, Inc.*, 791 F.3d 754, 761 (7th Cir. 2015), a conclusory argument that amounts to little more than an assertion does not preserve a question for our

> review[,] *Betco Corp. v. Peacock*, 876 F.3d 306,
> 309 (7th Cir. 2017).

*Soo Line R.R. Co. v. Consol. Rail Corp.*, 965 F.3d 596, 601 (7th Cir. 2020). Waiver doctrine rests on concerns about fair notice and the proper roles of the trial and appellate courts in our adversarial system.

One more point: Although we construe pro se filings liberally, pro se litigants are generally subject to the same waiver rules as those who are represented by counsel. *Douglas v. Reeves*, 964 F.3d 643, 649 (7th Cir. 2020).

Even liberally construed, Johnson's pro se filings in the district court never raised and developed a claim for damages for his prolonged detention in solitary confinement. As the case comes to us, the record is entirely undeveloped on the issue of the physical and psychological effects of solitary confinement, either in general or in Johnson's case in particular. The record clearly establishes that he suffered from serious mental illness predating his transfer to Pontiac and remained seriously mentally ill during the extended time he spent in solitary confinement, cycling between periods of stability and crisis. But it is equally clear that neither Johnson's complaint nor his response to the summary-judgment motions hinted at a claim for damages stemming from his placement or continuation in solitary confinement. To repeat, he challenged the loss of yard privileges, certain cell conditions, and the adequacy of his mental-health treatment.

Accordingly, neither the corrections officials nor the Wexford defendants developed legal arguments or an evidentiary record to meet a general attack on the use of solitary confinement or even a more focused argument

regarding the use of solitary confinement as a response to Johnson's persistent and serious misconduct. Nor did the judge address any such claim in his summary-judgment ruling. There was no need to. Read fairly and with generosity, Johnson's filings never mentioned such a claim.

To be sure, the reframed appellate argument incorporates some of the evidence underlying Johnson's original claims—but only as part of the background for the newly raised challenge to his solitary confinement. That could be construed as an abandonment of the claims raised below. We have nonetheless carefully reviewed the record and are satisfied that the judge properly entered judgment for the defendants on the claims pertaining to the loss of yard access and poor cell conditions.

We begin with the familiar deliberate-indifference liability standard:

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw that inference.

*Farmer v. Brennan*, 511 U.S. 825, 837 (1994). The claim thus has subjective and objective elements, "each of which must be satisfied." *Quinn*, 8 F.4th at 565. The plaintiff must prove that the defendant was subjectively aware of and intentionally disregarded an objectively serious risk to his health or safety. *Id.* at 565–66.

The record is unclear about how often or for how long Johnson endured each of the harsh cell conditions he complained of below. (Recall that he was moved to a different cell some 40 times.) Generally speaking, challenges to conditions of confinement cannot be aggregated and considered in combination unless "they have a mutually enforcing effect that produces the deprivation of a single, identifiable need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). That's because "[n]othing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.*

The record does not establish the frequency, severity, or duration of the unsanitary cell conditions, excessive heat, or poor ventilation in Johnson's cells, making it hard to evaluate the objective component of the claim. And even if we assume that one or more of these conditions was objectively serious, there's a failure of proof on the subjective element. The record lacks an adequate factual basis to evaluate the state-of-mind question for each defendant regarding each of the complained-of cell conditions. Without sufficient evidence of their subjective culpability, they cannot be held liable.

The yard-access claim is deficient under our decision in *Pearson*. There we held that a 90-day period of no yard privileges as a sanction for misconduct does not inflict cruel and unusual punishment on an inmate in segregation. *Pearson*, 237 F.3d at 884. We further held that imposing consecutive 90-day periods of no-yard privileges for separate misconduct violations does not violate the Eighth

Amendment unless the sanctions were meted out for "some utterly trivial infraction of the prison's disciplinary rules." *Id.* at 885. *Pearson* involved a challenge to four "stacked" 90-day yard restrictions, for a total of 360 consecutive days. The sanctions were imposed for beating a guard, spitting on a guard, setting fire to cell property, and throwing bodily fluids at a medical technician. *Id.* That is not trivial misconduct, so the challenge to the aggregated 360-day no-yard sanction failed. *Id.*

Johnson's cumulative yard restrictions were far longer: about three years in total, approximately two years of it consecutive. But he did not argue below (and does not argue here) that his misconduct was trivial, either individually or in the aggregate. Nor could he. While perhaps not as violent as the misconduct at issue in *Pearson*, his violations were continuous, serious, and sometimes highly dangerous, including spitting on inmates or guards and throwing urine and feces. Summary judgment for the defendants on this claim was appropriate.

The rest of Johnson's opening brief consists of seven short pages directed at the challenge to the adequacy of his mental-health treatment. Though the argument is thin—almost an afterthought—this claim was preserved below and is raised again here, so we turn to it now. We can be brief. To prevail, Johnson needed to present evidence that one or more of the defendants deliberately disregarded his mental-health needs. *Quinn*, 8 F.4th at 565. More specifically, he needed evidence that the defendants "actually knew of [his] serious health need and acted with deliberate indifference to [his] suffering." *Howell v. Wexford Health Sources, Inc.*, 987 F.3d 647, 653 (7th Cir. 2021).

For a claim against a prison medical provider, the plaintiff must show that "the medical professional's response was so inadequate that it demonstrated an absence of professional judgment." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 763 (7th Cir. 2021) (quotation marks omitted). A mere difference of opinion about a treatment decision will not suffice; "[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances." *Id.* (quotation marks omitted). Put slightly differently, "where a prisoner has received at least *some* medical treatment[,] … he must show a substantial departure from accepted professional judgment, practice, or standards." *Eagan v. Dempsey*, 987 F.3d 667, 683 (7th Cir. 2021) (quotation marks omitted). And "expert medical evidence is often required to prove this aspect of [the] claim." *Id.* (quotation marks omitted).

There's no real dispute about the objective element of the claim here: Johnson clearly suffered from serious mental illness. But the record falls far short on the subjective element. The evidence shows that the Wexford defendants evaluated Johnson when he arrived at Pontiac, developed a treatment plan for his mental illnesses, and continuously monitored his condition, adjusting his medication as needed. He maintains that they should have transferred him to a specialized mental-health unit far sooner. This argument reflects a difference of opinion about his medical care. There is no expert testimony that their treatment decisions represented a departure from accepted professional standards—much less a *substantial* departure—and no evidence suggests that their decisions were not actually based on medical judgment.

The *Monell* claim against Wexford itself suffers from two deficiencies: there is no proof of an underlying constitutional violation by any individual Wexford defendant nor any evidence that an institutional policy caused such a violation. *Quinn*, 8 F.4th at 568.

Johnson's discussion of this claim does not mention the corrections defendants. We take that as a waiver, but we add that any claim against them fails for a different reason. "We have long recognized that the division of labor within a prison necessitates that non-medical officials may reasonably defer to the judgment of medical professionals regarding inmate treatment." *Giles v. Godinez*, 914 F.3d 1040, 1049 (7th Cir. 2019).

Before closing, we note for completeness that Johnson does not challenge the judge's denial of his several requests under 28 U.S.C. § 1915(e)(1) to recruit pro bono counsel. The standard of review is highly deferential: "[T]he question on appellate review is not whether we would have recruited a volunteer lawyer in the circumstances, but whether the district court applied the correct legal standard and reached a reasonable decision based on facts supported by the record." *Pruitt*, 503 F.3d at 658. This deference means that a decision not to recruit counsel is seldom reversible error. We express no view on this issue because it was not raised.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

ROVNER, *Circuit Judge,* dissenting in part. Although the appellant and the amici present strong arguments that confinement in a segregation unit, particularly for the length of time and under the conditions here, is constitutionally problematic, I agree with the panel that the issue as to the constitutionality of solitary confinement itself was never presented to the district court. Therefore, I join the majority in concluding that this issue was not before us, and in its disposition of the remaining issues with one exception.

I cannot join in the opinion to the extent that it upholds summary judgment as to the yard restrictions. In contrast to the issue of segregation itself, the constitutionality of the yard restrictions, which operated to virtually eliminate all opportunity to exercise, was directly preserved in the district court and is argued here. And it, too, necessarily involves consideration of the conditions of confinement in the segregation unit. See *Delaney v. DeTella*, 256 F.3d 679, 683 (7th Cir. 2001) (noting that "segregation is akin to solitary confinement and that such confinement, uninterrupted by opportunities for out-of-cell exercise could reasonably be described as cruel and, by reference to the current norms of American prisons, unusual") (internal quotation marks omitted). For more than three years, Johnson was held in segregation and denied virtually all access to exercise as a punishment for his refusal, or inability, to comply with prison rules. The result was a deteriorating mental state that virtually ensured further rules violations, creating a self-perpetuating cycle. But access to exercise is not a perquisite or privilege to be used as a sword to ensure compliance with any institutional rule. It is an essential human need, and Johnson's challenge to those conditions should have survived summary judgment. See *Wilson v. Seiter*, 501 U.S. 294, 304 (1991).

In segregation at Pontiac, Johnson was held in isolation day and night, in a windowless cell, with a cell light that remained on 24/7, and behind a door that for most or all of his cell placements was a solid one. Meals were eaten in the cell and delivered through a slot in the door. He was allowed out of his cell once per week for a ten minute shower, and when not on yard restriction, was provided an opportunity to exercise in the yard on a weekly basis. Even in the yard, inmates were kept in individual cages, but the cage in the yard was a little bigger than his cell, contained a pull-up bar, and allowed room for exercise because in his cell any of his clothes and possessions had to be kept on the limited floor space as no shelves or storage options were provided. The rest of his time was spent in his cell in the segregation unit and therefore alone and isolated from others.

When on yard restrictions, Johnson was allowed only one hour per *month* of yard time, and even that time was routinely eliminated, thus essentially resulting in "24/7" solitary confinement. As the majority recognizes, the yard restrictions imposed in this case were extensive. Johnson was almost continuously under yard restrictions from January 2014 through August 2016, and under some restrictions from April to July 2013, which resulted in yard restrictions for over three years. For Johnson, who suffers from myriad mental disorders including antisocial personality disorder, severe depression, bipolar disorder, anxiety, and excoriation disorder (a disorder involving the repeated picking or scratching at one's skin), the impact of that prolonged isolation without the critical outlet of exercise was both terrible and predictable. During that time period, Johnson was regularly on suicide watch. He suffered from hallucinations, excoriated his flesh, cycled through different medications, experienced physical deterioration, and

engaged in the types of behavior, including the smearing of feces in his cell and on himself, that tragically we see all too often among inmates kept in such conditions for long periods of time.[1] After years of requesting a transfer to a specialized mental health unit and being denied, Johnson's request was finally granted and he was transferred out of segregation.

Among his objections to the conditions of his confinement while in that segregation unit, Johnson challenges those yard restrictions, arguing that "prolonged solitary confinement cannot be imposed without access to regular out-of-cell exercise (whether indoor or outdoor) unless a pressing security concern necessitates this severe restriction." Appellant's Brief at 20. As to that issue, I would vacate the district court's grant of summary judgment and remand the case.

---

[1] See e.g. *Ruiz v. Johnson*, 154 F. Supp. 2d 975, 984–85 (S.D. Tex. 2001) (noting a court finding that Texas's segregation units were "virtual incubators of psychoses," and describing in tragic detail the behavior of inmates in segregation, presented as "an everyday occurrence," including smearing themselves in feces, urinating on their cell floor, babbling incoherently, shrieking, banging their heads on the side of the wall and screaming, or withdrawing and appearing incommunicative*); Davis v. Baldwin*, 2021 WL 2414640, at \*15–16 (S.D. Ill. June 14, 2021) (describing expert testimony as to the conditions of restrictive housing units in Illinois, which found that virtually all of the prisoners suffered psychological deterioration, with frequent reports of depression, near-constant anxiety, bouts of anger, and feelings of impending breakdown, and with descriptions as well of hallucinations, playing with and/or eating their own feces, self-mutilation, and suicide attempts); *Freeman v. Berge*, 441 F.3d 543, 544–45 (7th Cir. 2006) (discussing the problems of inmates throwing feces or urine, and smearing feces and blood on walls); *Gillis v. Litscher*, 468 F.3d 488, 490–91 (7th Cir. 2006) (describing behavior of inmate, after he had been deprived of all human contact and sensory stimuli for three days, including smearing blood and feces around his cell).

In assessing an action under the Eighth Amendment's pro-
hibition against cruel and unusual punishment, courts con-
sult the "'evolving standards of decency that mark the pro-
gress of a maturing society,'" *Delaney*, 256 F.3d at 683, quoting
*Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). "Thus, conditions
which may have been acceptable long ago may be considered
unnecessarily cruel in light of our growing understanding of
human needs and the changing norms of our society." *Id*. For
well over 20 years, we have recognized that the failure to pro-
vide opportunities for exercise to prisoners can violate the
Eighth Amendment. In 1995, we recognized that "exercise is
now regarded in many quarters as an indispensable compo-
nent of preventive medicine," *Anderson v. Romero*, 72 F.3d 518,
528 (7th Cir. 1995), and by 2001 we held that "exercise is no
longer considered an optional form of recreation but is in-
stead a necessary requirement for physical and mental well-
being." *Delaney*, 256 F.3d at 683. At that time, we "acknowl-
edged the strong likelihood of psychological injury when seg-
regated prisoners are denied all access to exercise for more
than 90 days." *Id*. at 685; see also *Davenport v. DeRobertis*, 844
F.2d 1310, 1313 (7th Cir. 1988) ("isolating a human being from
other human beings year after year or even month after
month can cause substantial psychological damage"); *Pearson
v. Ramos*, 237 F.3d 881, 884 (7th Cir. 2001) ("long stretches of
[solitary] confinement can have serious adverse effects on
prisoners' psychological well-being" and can be described as
cruel under the Eighth Amendment if "unrelieved by oppor-
tunities for out-of-cell exercise"). In fact, we noted in *Delaney*
that the medical director of the Illinois Department of Correc-
tions testified to the "'serious adverse effects on the physical
and mental health' of segregated inmates who were denied
access to exercise," with the result that the Department issued

an institutional directive requiring five hours of exercise per week for segregated inmates. *Id.* at 686, quoting *Davenport*, 844 F.2d at 1314.[2] Because yard restrictions which deny the prisoner the ability to exercise deprive him of a necessity for physical and mental well-being and create a strong likelihood of psychological injury, a disciplinary restriction with such an impact on the health of prisoners cannot be imposed lightly if it is to survive Eighth Amendment scrutiny.

In upholding summary judgment against Johnson on that claim, the majority relies on *Pearson* as holding that "a 90-day period of no yard privileges as a sanction for misconduct does not inflict cruel and unusual punishment on an inmate in segregation." Maj. op. at 13. Again relying on *Pearson*, the majority also holds that "imposing consecutive 90-day periods of no-yard privileges for separate misconduct violations does not violate the Eighth Amendment unless the sanctions were meted out for 'some utterly trivial infraction of the prison's

---

[2] The amicus brief filed in this case by former corrections directors and experts from Pennsylvania, Oklahoma, Texas, Washington, New Hampshire, and New York City, provides strong evidence that the norms are continuing to change, with a growing, widespread antagonism to solitary confinement and exercise restrictions such as those presented here. For instance, they provide evidence of an increasing rejection of solitary confinement as to all but the most dangerous inmates, and evidence that decreased use of isolation and an increase in out-of-cell exercise in institutions has consistently resulted in a substantial decrease in violence, resulting in an improvement of prison security and a reduction of operating costs. Correctional Brief at 3, 9–11, 13, 17–18, 26. They also note that the American Correctional Association, the largest accrediting body in the United States for correctional institutions, proposed standards for limiting the use of isolation and ensuring opportunities for outdoor exercise. *Id.* at 8. I do not explore those changing norms, however, as that evidence and those arguments were not before the district court.

disciplinary rules.'" Maj. op. at 13-14, quoting *Pearson*, 237 F.3d at 885. The majority then concludes that Johnson failed to argue that his misconduct which led to yard deprivations was "trivial," and that he could not make any such argument because his violations were "continuous, serious, and sometimes highly dangerous, including spitting on inmates or guards and throwing urine and feces." Maj. op. at 14.

As an initial matter, the *Pearson* holding that a yard restriction limited to 90 days is not cruel and unusual punishment is a qualified one. The *Pearson* court cautioned that the 90-day threshold avoids constitutional issues "[a]t least in general," but noted that the cruel and unusual punishments clause has both a relative and an absolute component, and that even a 90-day denial of yard privileges could violate the Eighth Amendment if imposed for a trivial infraction. *Id*. at 884-85. The "trivial" language, then, applied in *Pearson* even to a single 90-day restriction, and not only to consecutive 90-day periods for separate misconduct allegations. See *Turley v. Rednour*, 729 F.3d 645, 652 (7th Cir. 2013) (noting that *Pearson* held that even a lockdown not greater than 90 days could violate the Eighth Amendment if imposed for a trivial infraction, and noting that in *Pearson* the prisoner behaved "like a wild beast" when out of the cell, which made confinement to his cell the "least cruel measure" for dealing with him). Prison officials cannot immunize their yard restrictions from constitutional inquiry by staying within a 90-day limit. Regardless of the duration of the restriction, we must consider whether the restriction constitutes cruel and unusual punishment.

Moreover, the language in *Pearson* regarding "trivial" infractions must be read in light of the issue actually before the court. The four infractions at issue in *Pearson* were

indisputably "serious" ones that involved: attacking and beating a guard such that the guard required hospitalization; setting fire to blankets, coats and boxes so as to require evacuation of prisoners with respiratory problems; spitting in the face of a guard who was trying to restrain him after he assaulted another guard; and throwing a broom and a bottle of bodily fluids at a medical technician, such that the fluids got in the victim's face. 237 F.3d at 885. Because the yard restriction was necessary for the security of the staff and prisoners, *Pearson* did not have occasion to consider the other end of the spectrum of misconduct–behavior which would be insufficiently serious to justify the deprivation of the right to exercise under the Eighth Amendment. See e.g. *Delaney*, 256 F.3d at 684 (emphasizing that *Pearson* addressed "*serious violations* of prison disciplinary rules) (emphasis in original). The infractions in *Pearson* "marked the plaintiff as violent and incorrigible," such that "[t]o allow him to exercise in the yard would have given him additional opportunities to attack prison staff and set fires." *Pearson*, 237 F.3d at 885. Accordingly, "[p]reventing access to the yard was a reasonable method of protecting the staff and the other prisoners from his violent propensities." *Id*. In such a circumstance, the court held that any objection to the punishment on considerations of proportionality would be unavailing. *Id*. The court further considered whether the denial of yard privileges for a year does so much harm that it is "intolerable to the sensibilities of a civilized society no matter what the circumstances," and it answered in the negative, noting that other cases supported that conclusion including *Martin v. Tyson*, 845 F.2d 1451, 1456 (7th Cir. 1988) (per curiam), *Bass v. Perrin*, 170 F.3d 1312, 1316–17 (11th Cir. 1999), and *LeMaire v. Maass*, 12 F.3d 1444, 1457-58 (9th Cir. 1993). *Pearson*, 237 F.3d at 885.

Those cases cited in *Pearson* illustrate the type of situations in which a restriction on yard access can be constitutionally justified as not intolerable in a civilized society. In *Martin*, the court held that there were no outdoor exercise facilities available and that the space within Martin's cell allowed for exercise, but also that Martin posed a security risk because he was facing criminal charges for an escape from jail. 845 F.2d at 1456. The court therefore concluded that the limitation on his access to the outdoors was related to a legitimate prison concern. *Id*. *LeMaire* similarly recognized that out-of-cell exercise could be denied where it would present a serious security threat. In that case, the court recognized that exercise was one of the basic human necessities protected by the Eighth Amendment. *Id.* at 1457. The court upheld the suspension of LeMaire's yard exercise privileges in that case because he abused the privileges and represented a grave security risk when outside his cell, including by attacking a fellow inmate while in the recreation yard, and on a different occasion attacking two officers while exiting the exercise cubicle–an attack which he vowed to repeat. *Id*. at 1448-49, 1458. The court also noted that LaMaire was able to exercise in his cell, as it was large enough and the prison supplied tennis shoes for that purpose, and that the restriction on exercise privileges was tied to his actions indicating a serious security threat. *Id*. at 1458. Finally, in *Bass*, we held that the restrictions on yard time were not without penological justification because "it would be hard to imagine a situation in which two persons had shown a greater threat to the safety and security of the prison." 170 F.3d at 1316. Each of the prisoners had been convicted of violent crimes and were serving life sentences, and each had attempted to escape during yard time–with one having five convictions for escape. *Id*. The common thread in

those cases cited in *Pearson*, then, is that a restriction on out-door exercise opportunities can be constitutional where participation by the inmate in that yard time would present a serious security threat, such as the risk of an escape attempt or an attack on others in the yard.

That holding is consistent with the holdings in other cases in which restrictions on exercise were imposed upon prisoners by the institution. In those cases, we have repeatedly held that "'[t]o deny a prisoner *all* opportunity for exercise outside his cell would, the cases suggest, violate the Eighth Amendment unless the prisoner posed an acute security risk if allowed outside of his cell for even a short time.'" *Delaney*, 256 F.3d at 687, quoting *Anderson*, 72 F.3d at 527. That approach to assessing exercise restrictions was echoed recently by Justice Sotomayor in a statement respecting the denial of certiorari in *Apodaca v. Raemisch*, 139 S. Ct. 5, 7-8 (2018), noting that with respect to deprivations of outdoor exercise, "the presence (or absence) of a particularly compelling security justification has, rightly, played an important role in the analysis of the Courts of Appeals," and that "[i]t should be clear by now that our Constitution does not permit such a total deprivation [of outdoor exercise] in the absence of a particularly compelling interest."

That focus is consistent with our treatment of deprivations of food or warmth, which, like exercise, have been identified as essential human needs for Eighth Amendment purposes. See *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (considering, in the Eighth Amendment analysis, whether the actions included "the deprivation of a single, identifiable human need such as food, warmth, or exercise."); *Isby v. Brown*, 856 F.3d 508, 522 (7th Cir. 2017) (quoting *Wilson*); *Smith v. Dart*, 803

F.3d 304, 311 n.4 (7th Cir. 2015) (same); *LeMaire*, 12 F.3d at 1457-58 (same). In analyzing restrictions impacting such identifiable human needs, we have recognized that "there is a critical 'distinction, for purposes of applying the eighth amendment in the context of prison discipline, between punishment after the fact and immediate coercive measures necessary to restore order or security.'" *Rodriguez v. Briley*, 403 F.3d 952, 953 (7th Cir. 2005) quoting *Ort v. White*, 813 F.2d 318, 324-25 (11th Cir. 1987). Therefore, for instance, in *Rodriguez*, we upheld against an Eighth Amendment challenge the denial of showers and meals based on an inmate's failure to comply with rules applicable whenever they were outside their cells. 403 F.3d 952. The prison in *Rodriguez* had a rule requiring that certain of an inmate's belongings must be placed in a storage box whenever the inmate left the cell, to enhance fire safety, facilitate cell searches, and promote safety and security. *Id*. Rodriguez was forbidden to leave his cell, and therefore obtain meals or showers, until he complied with the rule, and he missed numerous meals and showers when he refused to do so. *Id*. We held that deliberate non-compliance with a valid rule does not convert the consequences into punishment, but specifically noted that "[i]t is not as if the sanction for violating the storage-box rule were to starve the violator or even force him to skip his next meal … . [a]s soon as Rodriguez puts his belongings in the storage box, he can leave his cell." *Id*. at 953. We distinguished in *Rodriguez* between coercive measures necessary for prison order and safety, with which Rodriguez had to comply in order to obtain the human needs of food and showers, and the withholding of such human needs as a punishment for a past violation. *Id*. at 953.

Similarly, in *Freeman v. Berge*, 441 F.3d 543, 544 (7th Cir. 2006), we addressed the denial of food service to Freeman

when he refused to comply with the rules for the receipt of food, including the requirement to stand in the middle of the cell and to wear shorts or pants while the food was delivered through the door slot. As a result of violations of that rule, Freeman was denied a significant number of meals, and he argued that the denial of food for the violation of a prison rule was cruel and unusual punishment under the Eighth Amendment. *Id*. We held that "there is a difference between using food deprivation as a punishment and establishing reasonable condition to the receipt of food." *Id*. at 545. We noted that the requirement to stand in the middle of the cell and to wear pants or shorts were conditions related to the security of officers delivering food, because it decreased the likelihood of inmates exposing themselves to officers or throwing urine or feces at them when delivering the food. On the other hand, we noted that the denial of meals for other reasons such as the refusal to clean his cell or for being asleep could be problematic because those violations could not be "easily related to the refusal to comply with a reasonable condition on the receipt of food." *Id*.

In *Gillis v. Litscher*, 468 F.3d 488, 491 (7th Cir. 2006), we again considered whether the conditions to which an inmate was subjected were sufficiently serious to deny him "the minimal civilized measure of life's necessities." Gillis was placed in a Behavioral Modification Program (the "Program") after violating the prison rule requiring inmates to sleep with their head positioned towards the back of the cell rather than aligning themselves on the bed with their head to the front, so that guards could see their heads through the small window on the cell door. *Id*. at 489-90. The Program involved progressive stages of various levels of deprivations. Stage one involved confinement to a cell with no clothes, property, or bedding, in

which he had to sleep naked on a concrete bed, and received nutri-loaf ("basically a ground-up block of food") for meals. *Id*. at 490-91. He argued that without clothing or bedding he was so cold he had to pace in his cell for some 14 hours trying to get warm, resulting in sores on his feet. *Id*. That stage was supposed to last for three days, but was continued for two more days after he smeared blood and feces around his cell, which the government argued can impair its ability to see through the window. *Id*. at 490. At stage two, which is supposed to last for seven days, he received some limited additional "privileges," including a one-piece item of clothing like a sleeveless poncho, and meals in his cell, although no bedding, mattress, or shower. *Id*. at 491. He suffered a deteriorating mental state, including becoming suicidal, under those conditions, and argued that the Program was a punitive measure unrelated to the conduct the officials were trying to correct, whereas the prison argued that the Program was not punitive and was merely an effort to convince him to conform his behavior to prison rules. *Id*. at 491. We recognized that Gillis could prevail on his Eighth Amendment claim only if he could show that the Program imposed conditions that denied him the "'minimal civilized measure of life's necessities,'" and that the prison officials in denying humane conditions of confinement knew the inmate faced a substantial risk of serious harm and failed to take reasonable measures to abate it. *Id*., quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). We held that Gillis could survive summary judgment on his Eighth Amendment claim that the conditions of confinement violated those minimal standards. In so holding, we distinguished Gillis's case from cases such as *Rodriguez* and *Freeman*, because Gillis "did not hold the keys to his own release." *Id*. at 494. Rodriguez could have corrected the situation

immediately by placing his items in the storage box, and Free-
man could have done the same by standing in the middle of
the cell clothed with pants or shorts. *Id*. As to them, we held
that "'deliberate noncompliance with a valid rule does not
convert the consequences that flow automatically from that
noncompliance into punishment,'" noting that there "'is a dif-
ference between using food deprivation as a punishment and
establishing a reasonable condition to the receipt of food.'" *Id*.
at 494, quoting *Rodriguez*, 403 F.3d at 952-53 and *Freeman*, 441
F.3d at 545. Gillis, in contrast, was not deprived of life's ne-
cessities only until he conformed with the prison rules. *Id*. at
495. Once he was placed in the Program, he had to complete
it in its entirety, and could not end it by altering his behavior.
Moreover, we rejected the argument that Gillis could have
avoided the Program altogether by not breaking the rules in
the first place, holding that such reasoning would "severely
limit valid Eighth Amendment claims" in that "[o]ne could
say that most punishments could be avoided by simply fol-
lowing the rules." *Id*.

Those cases relating to the denial of the basic human ne-
cessities establish the "critical 'distinction, for purposes of ap-
plying the eighth amendment in the context of prison disci-
pline, between punishment after the fact and immediate coer-
cive measures necessary to restore order or security.'" *Rodri-
guez*, 403 F.3d at 953, quoting *Ort*, 813 F.2d at 324-25. Even
where a prison rule is violated such as the failure to sleep in
an orientation that would enable proper observation, we have
recognized that the denial of essential human needs can result
in unconstitutional conditions of confinement. Here, the dep-
rivation of all opportunities to exercise deprived Johnson of
an essential human need, and it was an after-the-fact punish-
ment not a coercive measure. Johnson could not restore his

ability to exercise by simply complying with the rule. Once the violation was assessed, he could not exercise for the entirety of the 2 to 3 month period regardless of his conduct. If the deprivation here was food, clothing or warmth, the cases cited above would be clear that the total deprivation adequately alleged a violation of the Eighth Amendment. But exercise, too, has been recognized as a basic human need, rendered even more critical for inmates in segregation. The deterioration of the physical and mental health of inmates who are deprived of all out-of-cell, or even in-cell, options has been recognized for decades now. And our cases establish that basic human needs cannot be denied as a punishment unrelated to serious immediate security and safety needs.

Many, if not most, of the disciplinary infractions in this case do not signify any acute security risk, such as a threat of an escape attempt or a danger to other prisoners or correctional officers, as was present in the cases in which expansive yard restrictions were upheld.[3] The infractions in this case

---

[3] The majority here first holds that Johnson failed to argue below or on appeal that his misconduct was trivial, and then holds that he could not make such an argument in any event because his violations–though not as violent as the conduct in *Pearson*–were continuous, serious and sometimes highly dangerous. Maj. op. at 14. In the court below, Johnson sought the appointment of counsel numerous times, and was denied that appointment, so we liberally construe his pleadings, as a pro se litigant, in determining whether an issue was adequately raised. The record in this case, including the state's statement of undisputed facts, sets forth numerous disciplinary infractions which resulted in the loss of yard privileges but which do not reflect any security risk related to the use of the yard. Moreover, in response to the summary judgment motion, Johnson pointed out that problem, asserting that he was deprived of out-of-cell exercise based on infractions that were not yard related at all. App. 728, #3. That sufficiently raises the issue. On appeal, the briefs further develop the issue. In

that resulted in yard restrictions include some assaults—which involved spitting at or in the direction of other inmates and the throwing of feces, urine, or other liquid—which the state certainly could argue constitute a serious security issue, but numerous other infractions which resulted in the denial of yard time for many additional months do not by their nature indicate any security threat to yard access by Johnson. For instance, according to the Undisputed Material Facts in the State Defendants' Motion for Summary Judgment, Johnson was assessed 3 months' yard restriction for an incident on May 12, 2014, for the infraction of covering his door window with feces. App. 520 # 112, 522 #117. The Department of Corrections Adjustment Committee Report further reveals that he received 3 months' yard restrictions for an incident on February 17, 2016, based on the observation that "water and what appeared to be human feces was coming out of offender Johnson's cell," and a Disciplinary Card indicates that he received 2 months' yard restriction for possession of another inmate's social security number on February 18, 2016. App. 586, 578. Those infractions accounted for a full eight months of yard

---

fact, the first sentence in the Appellant's Summary of Argument states that every federal court of appeals including our own "has held that prolonged solitary confinement cannot be imposed without access to regular out-of-cell exercise (whether indoors or outdoors) unless a pressing security concern necessitates this severe restriction," and then proceeds to state that no such security risk exists here. Appellant Brief at 20. The brief subsequently develops its argument that out-of-cell exercise is required absent an extraordinary security risk , and that no such security risk is present here or is even asserted by the government. Appellant Brief at 34, 36-39; see also factual basis of claim *id*. at 4-10. Accordingly, this issue is presented to us.

restrictions. Moreover, the yard restrictions ordered for Johnson were imposed consecutive to each other, without any pause from one punishment to another for even a week of yard access, thus magnifying the adverse impact. See *Bass*, 170 F.3d at 1316 (recognizing that with respect to solitary confinement, there is a "significant difference between some time outside–even a minimal amount–and none at all"). None of those infractions involved charges of assaults. The charges alleged for those infractions included "impairment of surveillance," "health, smoking or safety violation," and "disobeying a direct order" (all three of which were cited for incidents such as smearing feces on the cell window and refusing to clean it). And other infractions in the record, in which the disciplinary report in the record contains the charge but not the factual details, also do not on their face reflect any security risk related to yard access. Additional charges of impairment of surveillance, disobeying an order, insolence, property damage, and giving false information to an employee, accounted for another 18 months of yard restrictions. Only 11 months of yard restrictions were attributed to charges of assault, with 26 months to charges other than assault, and all of those assault charges involved spitting at or in the direction of others except for one charge based on throwing an unknown liquid substance.

Considering only the infractions identified above for which we have a factual basis, however, none present the type of acute security risk that can support a granting of summary judgment as to the constitutionality of that expansive denial of the right to exercise–a right rendered even more critical given that Johnson was in segregation and that exercise constituted his only regular reprieve from the isolation of the cell and the psychological deterioration that comes with that

situation. The question here is not whether such misconduct warranted disciplinary action. Indeed, Johnson received other consequences for the infractions in addition to the yard restriction. For each of those infractions, Johnson also received discipline in the form of 2-3 months' additional segregation. But the yard restrictions at issue deprived Johnson of all but one hour a month of out-of-cell exercise (with even that one hour regularly cancelled and not rescheduled) even though the infractions did not indicate that Johnson would present a security risk or a safety threat if allowed access to the yard, with its individual cages, to exercise. The imposition of consecutive yard restrictions for those infractions is particularly disturbing in light of the admission in the State's Statement of Undisputed Facts that "Plaintiff would voluntarily cover himself and his cell with feces due to his mental illness." App. 523, #132. Given the acknowledgment that his mental illness contributed to that behavior, it is particularly problematic to then use that conduct as a basis to deny yard privileges—when the access to exercise is recognized as critical for mental health, and denial of that exercise for segregated prisoners for more than 90 days creates the strong likelihood of further psychological injury. *Delaney*, 256 F.3d at 685. That creates a cycle which a prisoner in segregation will be ill-equipped to overcome. The Constitution cannot countenance such a routine use of yard restrictions absent any security concerns with the actual yard access by the prisoner.

And significantly, the defendants do not assert that there are indeed any such security concerns. In fact, there are no allegations that any infraction occurred during yard time, whether serious or trivial. Accordingly, as to the yard restrictions, the district court cannot determine as a matter of law that the Eighth Amendment is not violated, and on

summary judgment that is the standard. Given the absence of any argument from the defendants that the yard restrictions were necessary for safety and security reasons, and given the numerous disciplinary infractions that on their face do not involve any apparent security risk to yard access, the district court's grant of summary judgment as to the challenge to the yard restrictions was improper.[4]

For those reasons, I respectfully dissent as to the grant of summary judgment regarding the challenge to the denial of exercise.

---

[4] I express no opinion as to whether qualified immunity would apply regarding any of the claims as to the state defendants, as they acknowledge that they forfeited the issue by not raising it below