In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-1775

ELLIOTT D. LEVIN, as Chapter 7 Trustee for
Irwin Financial Corporation,

*Plaintiff-Appellant*,

*v.*

WILLIAM I. MILLER,
GREGORY F. EHLINGER, and
THOMAS D. WASHBURN,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:11-cv-01264-SEB-MPB — **Sarah Evans Barker**, *Judge*.

ARGUED OCTOBER 25, 2017 — DECIDED AUGUST 17, 2018

Before KANNE and SYKES, *Circuit Judges*, and DARROW,
*District Judge*.[*]

---

[*] Of the Central District of Illinois, sitting by designation.

SYKES, *Circuit Judge*. Irwin Financial Corporation was a holding company for two banks that failed in the wake of the 2007–2008 financial crisis. When the crisis began, regulators and Irwin's outside legal counsel both advised the company to buoy up its sinking subsidiaries. Irwin's Board of Directors therefore instructed the officers to do everything they could to save the banks. The officers tried to raise capital and applied for government aid, but the chances of success were slim. Private investors showed little interest in the company, and federal regulators signaled that a bailout was unlikely.

A small glimmer of hope flickered in 2009: Irwin received a $76 million tax refund. The Board authorized Irwin's officers to transfer the refund to the subsidiary banks and for good reason: The Board believed that the refund legally belonged to the banks and hoped the cash infusion would keep them above water long enough for help to arrive. But the refund was not enough to save the day. Management could not raise sufficient capital, the hoped-for government relief never materialized, the banks failed, and Irwin filed for bankruptcy.

Elliott Levin was appointed as Chapter 7 trustee for Irwin's bankruptcy estate, and he promptly filed suit against three of Irwin's former officers. The suit alleged, among other things, that the officers breached their fiduciary duty to provide the Board with material information concerning the tax refund. Levin's legal theory rested on an elaborate chain of assertions. He claimed the officers should have known the banks were going to fail, so they should have investigated alternatives to transferring the tax refund—specifically, an earlier bankruptcy—despite the Board's clear

directive to support the banks. Had the officers done so, they would have discovered that Irwin might be able to claim the $76 million tax refund as an asset in bankruptcy. And if the officers had presented this information to the Board, the Board would have declared bankruptcy *before* transferring the refund to the banks, thereby maximizing the holding company's value for creditors.

The district judge didn't buy Levin's speculative theory and neither do we. Corporate officers have a duty to furnish the Board of Directors with material information, but that duty is subject to the Board's contrary directives. The record clearly establishes that on the advice of government regulators and expert outside legal counsel, the Board had prioritized saving the banks. The officers had no authority to second-guess the Board's judgment with their own independent investigation. We affirm.

## I. Background

Before its bankruptcy, Irwin was the holding company for two subsidiary banks: Irwin Union Bank and Trust Company, which we'll call the "Bank and Trust," and Irwin Union Bank, FSB, which we'll call the "Savings Bank." William Miller was Irwin's CEO and Gregory Ehlinger was its CFO. Irwin's Board of Directors was largely independent: A supermajority of ten members were independent outside directors, and the Board held an executive session without Irwin's officers after each meeting. At the executive sessions, the directors discussed concerns and developed recommendations for management. Lance Odden, the designated lead director, would pass along these directives to Irwin's officers.

As financial institutions, Irwin and the banks were, of course, subject to considerable governmental oversight. Irwin was registered as a bank holding company with the Board of Governors of the Federal Reserve System. As a state-chartered member of the Federal Reserve System, the Band and Trust answered to both the Federal Reserve and the Indiana Department of Financial Institutions. The Savings Bank was a federally chartered savings bank regulated by the Office of Thrift Supervision. Finally, because the banks held federally insured deposits, both fell under the supervision of the FDIC.

In the midst of the 2007–2008 financial crisis, the Bank and Trust began to flounder. Regulators insisted that Irwin had a duty to support its struggling subsidiary. On February 28, 2008, a representative from the Federal Reserve Bank of Chicago attended a board meeting to discuss "regulatory concerns about [the Bank and Trust's] liquidity and [Irwin's] expected role as a source of strength for the [b]ank[s]." The representative "emphasized the preservation of capital at the [b]ank and the need to maintain liquidity."

Heeding the regulator's advice, Irwin adopted a resolution affirming its commitment to keeping the Bank and Trust capitalized. Among other things, the resolution emphasized "the importance of ensuring that the enterprise maintains adequate capital to support its business operations."

As the crisis raged on, Irwin turned to independent legal counsel for advice. The Board retained Rodgin Cohen and other attorneys at Sullivan & Cromwell for advice on the Board's duties in the fraught regulatory landscape. The Board began meeting every Friday with outside counsel present. Cohen and his colleagues reported directly to the

Board, and the Board expected Irwin's management to follow their advice.

Cohen urged the Board to support the banks. He advised the directors of their duty under the Source of Strength Doctrine, which requires bank holding companies to provide assistance to subsidiaries in times of financial distress. The Board members apparently took his advice to heart. According to one director, the Board was committed to saving the banks because it "was the prudent course of action and consistent with our fiduciary duties based on Mr. Cohen's counsel [and] statements from regulators."

That commitment was soon put to the test. In May 2008 the Chicago Federal Reserve and Indiana Department of Financial Institutions advised Irwin that the Bank and Trust was in trouble and supervisory action would follow. Two months later the regulators sent a Memorandum of Understanding demanding that Irwin obtain a $50 million cash infusion by the end of August. On Cohen's advice the Board directed management to sign and deliver the memorandum.

Irwin failed to raise $50 million by the deadline. Regulators then sent the Board a formal Written Agreement requiring Irwin and the Bank and Trust to develop a plan to "improve management of [their] liquidity positions" and "maintain sufficient capital." Faced with these demands and uncertain of its duties, the Board again turned to outside counsel for advice. At the October 10, 2008 meeting, counsel advised the Board to "be actively engaged in doing whatever [it] can to ensure the bank remains solvent." That same day the Board approved the Written Agreement and authorized Miller, the CEO, to execute it.

In the meantime Irwin began looking to federal programs for relief. In October 2008 Congress created the Troubled Asset Relief Program ("TARP"), which authorized the Treasury Department to purchase troubled assets from financial institutions after considering various factors, including the "long-term viability of the financial institution." 12 U.S.C. § 5213(4). The standard for analyzing a bank's viability was left to the discretion of regulatory agencies, which included the discretion to decide whether TARP funds should be included in the analysis. In November 2008 the Board authorized and submitted an application for $148 million in TARP funds.

The application faced an uphill battle. On November 21 the Board learned that a bank with a financial health rating of 4 or 5 would receive TARP funding only as part of an acquisition by another bank. Irwin had a rating of 4, and the prospects of a buyout looked grim.

The Board continued to prioritize the Bank and Trust's capitalization. During the December 4 meeting, the Board affirmed that the Written Agreement's capital-sufficiency requirement was "of critical importance and should remain a primary focus of management." The Board then "authorized management to move additional equity capital from [Irwin] into [the Bank and Trust]," and the officers duly transferred $14 million.

Yet the Bank and Trust's fortunes continued to decline. At the December 17 meeting, the Board learned that the Reserve Bank had downgraded its financial health rating to a 5. While ominous, the downgrade didn't mean certain failure. The bank remained adequately capitalized, and Cohen reassured the Board that he had seen banks with a 5

rating survive with additional capital. And the possibility of a government bailout was still on the table. A representative from the Federal Reserve explained that the TARP eligibility criteria were not static, and although it would be "extremely challenging" for Irwin to receive approval, the Federal Reserve remained "receptive to listening." The representative advised that the Board's plan to raise $50 million in equity could be a game changer and would make TARP funding more likely.

To stand a chance, Irwin believed it needed the Federal Reserve to endorse its TARP application. In January 2009 Miller and Odden reached out to the Federal Reserve and asked what Irwin needed to do to win support. After several weeks of silence, the Federal Reserve finally responded. The demands were staggering. Among other things, Irwin would need to raise $150 million in capital and appoint a new CEO. And even with the Federal Reserve's support, there was no guarantee that the Treasury Department would approve Irwin's application. In a subsequent board meeting, Irwin's investment-banking advisor dismissed the possibility of raising $150 million as "remote" and cautioned against basing future plans on that possibility. Unless the government changed the policy, the TARP application was certain to fail. Irwin accordingly lobbied the Treasury to enact a policy more favorable to its application.

Around this same time the Board approved the 2009 Tax Allocation Agreement that lies at the heart of this controversy. The agreement provided, as it had since 1999, that Irwin would file consolidated federal income-tax returns on behalf of itself and the banks. Under the agreement if a bank would have been entitled to a tax refund had it filed separately,

Irwin would transfer the appropriate amount after receiving the consolidated refund from the IRS. Miller projected that Irwin would receive $90 million in tax refunds, most of which would be owed to the banks.

Irwin believed that the refunds were the banks' property, and it held the refunds in trust on their behalf. That was consistent with nonbinding regulatory guidance issued in 1998. *See Interagency Policy Statement on Income Tax Allocation in a Holding Company Structure*, 63 FR 64757-01 (Nov. 23, 1998). Several years after regulators issued this guidance, however, a bankruptcy judge in New York issued a contrary ruling, holding that a consolidated refund belonged to the parent and any payment owed to a subsidiary merely constituted a debt that became an unsecured claim in the parent's bankruptcy estate. *See Superintendent of Ins. for the State of N.Y. v. First Cent. Fin. Corp.* (*In re First Cent. Fin. Corp.*), 269 B.R. 481 (Bankr. E.D.N.Y. 2001), *aff'd sub nom. Superintendent of Ins. for the State of N.Y. v. Ochs* (*In re First Cent. Fin. Corp.*), 377 F.3d 209 (2d Cir. 2004).

Regulators continued to urge the Board to prop up the Bank and Trust. On May 7, 2009, just weeks before the disputed tax refund arrived, the Board's independent directors met in executive session with outside counsel and representatives from the Indiana Department of Financial Institutions, the FDIC, and the Chicago Federal Reserve. During the meeting, the Indiana Department of Financial Institutions warned of the consequences if the bank dropped below the "adequately capitalized" status. The FDIC explained its resolution process for managing the assets of insured banks that declare bankruptcy and urged Irwin to protect depositors by moving uninsured deposits into

insured status. The Chicago Federal Reserve expressed concern about the bank's liquidity but suggested that the anticipated tax refund could help. Finally, the FDIC advised Irwin to continue efforts to raise capital—especially by lobbying for changes in the TARP program—while the FDIC prepared for a possible resolution.

The Board agreed and once more directed the officers to keep the banks solvent. After excusing the regulators, the Board called Miller and the other officers back into the meeting and declared a dual-track strategy: Irwin would seek to "secure new capital with a government partnership," or should that endeavor fail, "manage a resolution process." The Board accordingly directed the officers "to pursue its policy approach with the US Treasury" and "mitigate negative outcomes of a[n] [FDIC] resolution for stakeholders." The Board also directed management to "focus[] on converting as much of the remaining uninsured deposit base as possible to fully insured status." In order to accomplish this task, the officers needed to financially support the banks long enough to convert uninsured deposits into insured status.

Shortly before the refund arrived, the Board faced yet another setback. Irwin had previously hired the accounting firm Ernst & Young to assist with the year-end 2008 audit, and the audit indicated that the Bank and Trust remained adequately capitalized. However, that result rested on a particular accounting assumption that Ernst & Young urged Irwin to confirm with the SEC. The SEC then issued guidance that contradicted Irwin's assumption and cast doubt on the bank's status. In a March 31, 2009 letter, Ernst & Young informed Irwin that after correcting the mistaken assump-

tion, the bank was no longer considered well capitalized. As a result, Irwin's ability to continue as a going concern was in serious doubt.

On June 2, 2009, Irwin received mixed messages from the Indiana Department of Financial Institutions and the Chicago Federal Reserve. In a joint letter to the Board, the regulators advised that the banks needed substantially more than $150 million to remain viable; Irwin's plan to raise $50 million was inadequate, and without capital infusion, the Bank and Trust's "likelihood of failure [was] imminent." Later that day, however, Cohen reported that after discussing the letter with the Chicago Federal Reserve, the regulators clarified that they were "not saying the [Bank and Trust] is in imminent danger of failure." Cohen also advised that the bank needed to remain adequately capitalized through June 30 to buy enough time to negotiate the TARP application with the Treasury. Although the negotiation might not succeed, Cohen said "there [was] a reasonable possibility."

Two days later Miller informed the Board that Irwin had received the consolidated tax refund, which he described as "great news for liquidity." On June 11 Irwin transferred the $76 million refund to the banks. Just over $74 million went to the Bank and Trust; the remainder went to the Savings Bank.

Irwin and its subsidiaries continued to hold out hope. In July Irwin received encouraging news that the Treasury had expressed interest in helping small- and medium-sized banks. Later that month the Board asked Cohen "if there was an alternative course of action that ha[d] not been identified by management." Cohen responded "that he [did] not know of additional things that could be done now other than what

management [was] doing." As late as August 13, 2009, Cohen maintained that there was hope for TARP funds.

But the TARP application was never approved. The banks closed and Irwin filed for bankruptcy on September 18, 2009. Levin was appointed Chapter 7 trustee of Irwin's bankruptcy estate while the FDIC was named receiver for the banks.

In September 2011 Levin filed suit in district court, *see* 28 U.S.C. § 1334(b), raising seven claims under Indiana law for breach of fiduciary duty against Miller, Ehlinger, and a third former Irwin officer.[1] The district judge initially dismissed the complaint for lack of standing because she believed that every count was derivative of claims that belonged to the FDIC as receiver for the banks. We affirmed in part and reversed in part, holding that Levin had standing to assert two of his claims. *Levin v. Miller*, 763 F.3d 667 (7th Cir. 2014).

On remand Levin filed an amended complaint limiting his claims to the two he had standing pursue. As relevant here, he alleged that Miller and Ehlinger breached their duty to provide the Board with material information. The trustee maintained that Miller and Ehlinger should have informed the Board that Irwin could maximize its value if it had declared bankruptcy *before* transferring the tax refund to the banks. The judge entered summary judgment for the officers, and Levin appealed.

---

[1] Thomas Washburn, who served as Irwin's Executive Vice President from 2000 until January 2008, was named as the third defendant, but the claims against him are not at issue here.

**II. Discussion**

We review the summary judgment de novo, drawing all reasonable inferences in Levin's favor. *Pain Ctr. of Se. Ind. LLC v. Origin Healthcare Sols. LLC*, 893 F.3d 454, 459 (7th Cir. 2018).

To prevail on a claim for breach of fiduciary duty, a plaintiff must show: "(1) the existence of a fiduciary relationship; (2) a breach of the duty owed by the fiduciary to the beneficiary; and (3) harm to the beneficiary." *Good v. Ind. Teachers Ret. Fund*, 31 N.E.3d 978, 983 (Ind. Ct. App. 2015) (internal quotation marks omitted). No one disputes that a fiduciary relationship existed; officers owe fiduciary duties to the corporation they serve. *See, e.g.*, *Biberstine v. N.Y. Blower Co.*, 625 N.E.2d 1308, 1318 (Ind. Ct. App. 1993).

Levin claims that the officers breached their duty to provide information to the Board. In Indiana an officer's duties are "determined by common law rules of agency," *Winkler v. V.G. Reed & Sons, Inc.*, 638 N.E.2d 1228, 1231 (Ind. 1994), and according to these rules, an agent has a duty to provide relevant information to the principal, *see* RESTATEMENT (THIRD) OF AGENCY § 8.11 (AM. LAW INST. 2006). To fulfill this duty, officers must "use reasonable effort to provide the principal with facts that the agent … should know when … the agent … has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal." *Id.*

Levin faults the officers for failing to inform the Board that an earlier bankruptcy could have maximized Irwin's value. His theory rests on a series of assumptions: (1) the officers should have seen the writing on the wall and real-

ized that the banks were doomed to fail and that transferring the tax refund would be a waste; (2) they should have investigated whether filing for bankruptcy earlier was a better option; (3) had they investigated, they would have hired a tax and bankruptcy expert who would have advised that Irwin could claim the refund as an asset in bankruptcy (based on the New York bankruptcy judge's decision); and (4) had the officers reported this information, the Board would have declared bankruptcy earlier, before transferring the tax refund, thereby maximizing Irwin's value and the size of the bankruptcy estate for the creditors.

Even on its own terms, Levin's complicated theory is dubious. The argument's intricate chain of inferences rests on a series of speculative and increasingly questionable links—especially the assertion that, contrary to both regulatory guidance and Irwin's years-long understanding (memorialized in a written agreement), the Board would have tried to claim the tax refund as its own asset in bankruptcy. Color us skeptical.

Nevertheless, Levin's theory fails for a more fundamental reason. The duty to provide information is not absolute; it is qualified by the duty to obey the Board's lawful instructions. Corporate "officers are chosen by, report to[,] and are subject to the direction of the board of directors." IND. CODE § 23-1-36-2 official cmt. Under the rules of agency, they have "a duty to comply with all lawful instructions" received from the Board, and they must comply with those instructions even if they "believe[] that doing otherwise would be better for the principal." RESTATEMENT (THIRD) OF AGENCY § 8.09(2) (AM. LAW. INST. 2006); *id.* cmt. c. Crucially, the duty to comply supersedes the duty to inform: An agent's obligation

to provide information is "subject to any manifestation by the principal." *Id.* § 8.11.

As the financial crisis deepened, the Board clearly manifested the intention to save the banks and directed the officers accordingly. In February 2008 the Board resolved to keep the Bank and Trust well capitalized. Later that year the Board authorized Miller to execute the written agreement requiring Irwin to maintain sufficient capital at the bank. The Board ordered Miller to make a $14 million capital contribution to the bank in December, and in May 2009 it directed the officers to continue trying to raise capital while preparing the bank's deposit accounts for a possible resolution.

As agents of the Board, the officers had a duty to execute the Board's strategy and directives. And that strategy was plainly incompatible with declaring bankruptcy. Insolvency would have killed any chance of government relief and cut short efforts to insure deposit accounts. The officers had no right—much less a duty—to pursue a course of action that directly contradicted the Board's clear instructions.

Nor did the officers have a fiduciary duty to hire an expert to second-guess the Board's judgment. The Board made its decisions based on the advice of regulatory agencies and deeply experienced outside counsel. The Chicago Federal Reserve, Indiana Department of Financial Institutions, and the FDIC all urged the Board to financially support its subsidiaries. The lawyers from Sullivan & Cromwell, whom the Board specifically retained for advice on fiduciary duties, agreed. The officers were not obligated to retain their own expert to challenge regulators, counsel, and the Board itself.

Levin insists that the Board never manifested a desire to *not* receive information about Irwin's potential value in bankruptcy. He claims the Board was not irrevocably committed to propping up the banks and that it may have changed course had it known that an earlier bankruptcy could maximize value. It would only be logical, Levin argues, for the directors to be interested in such information. Without it, he argues, the Board "hardly could have manifested a desire not to receive such information."

This argument rests on speculation and cannot be reconciled with the record. The Board's response to the crisis was driven by the demands of federal and state regulators and guided by expert outside counsel. Taking account of the regulatory directives and expert legal advice, the Board exercised its judgment and chose to devote its resources to saving the banks. As agents, the officers had no right to spend company resources pursuing a different strategy.

AFFIRMED.