In the

# United States Court of Appeals
## For the Seventh Circuit

No. 21-2393

WILLIE BALLE,

*Plaintiff-Appellant,*

*v.*

DAVID KENNEDY, *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court for the
Central District of Illinois.
No. 19-cv-1213 — **Joe Billy McDade**, *Judge.*

ARGUED APRIL 20, 2023 — DECIDED JULY 14, 2023

Before EASTERBROOK, ROVNER, and ST. EVE, *Circuit Judges.*

ST. EVE, *Circuit Judge.* A kitchen supervisor directed Willie Balle, an Illinois state prisoner, to carry near-boiling water across a wet, damaged floor in a plastic five-gallon bucket. His foot caught in a hole, and he fell down. The water splashed on him and caused severe burns. Balle sued several prison officials, claiming they violated the Eighth Amendment by being deliberately indifferent to the dangerous kitchen conditions. The district court dismissed some of Balle's claims at the

pleading stage and granted summary judgment on the others. We affirm in part and reverse in part.

## I. Background

### A. Factual Background

At the pleading stage, we take Balle's factual allegations as true, *Dorsey v. Varga*, 55 F.4th 1094, 1098–99 (7th Cir. 2022), and at summary judgment, we view the evidentiary record in his favor and draw all reasonable inferences in his favor. *Xiong v. Bd. of Regents of the Univ. of Wis. Sys.*, 62 F.4th 350, 353–54 (7th Cir. 2023). We present the facts in accordance with these principles, noting which facts are mere allegations or are in dispute.

#### 1. Balle's Injury

At all times relevant to this appeal, Balle was a prisoner in Pontiac Correctional Center. As of December 2018, he worked in the dining room, but on December 27, a supervisor told Balle that he had been transferred to the kitchen to work as a dishwasher. Balle objected to the transfer because inmates who worked in the kitchen sometimes had to carry buckets of water for washing dishes across the damaged kitchen floor, and Balle "knew the danger" of that practice. The supervisor told Balle that a different supervisor, Susie Hobart,[1] would have to undo the transfer when she returned from vacation. When she returned to work on January 2, 2019, Balle repeated

---

[1] Two pairs of defendants share last names: Daniel and Susie Hobart and David and Teri Kennedy. For clarity, we introduce these individuals by full name and use first names thereafter.

his objections, and Susie said she would do the paperwork needed to reverse the transfer.

Balle did not get his old job back in time. On January 2, the kitchen lacked hot water. Susie directed the inmates to heat water for washing dishes in large kettles on the stove on one side of the kitchen, then carry the water in plastic five-gallon buckets 35–40 feet to the sinks on the opposite side of the kitchen. The inmates heated the water to a simmer, with "little bubbles" and "steam coming off the top." The water "stayed hot"—"hot hot hot."[2] While carrying a full bucket to the sink, Balle's foot caught in a hole in the floor, and he fell to the ground. Scalding water spilled on his arm and back, soaking his shirt. When Balle removed the shirt, the skin of his arm came with it. He suffered second- and third-degree burns that resulted in permanent scarring and nerve damage.

### 2. The Kitchen Conditions

Many of the facts about the kitchen conditions are undisputed. David Kennedy, the prison's chief engineer, stated that the hot water in the kitchen only worked sporadically and often required repair. The record is unclear about how frequently the kitchen lacked hot water, but there is evidence that the hot water malfunctioned three times between late November 2018 and early January 2019.[3] First, maintenance

---

[2] Balle estimated the water temperature to be 200–250 degrees Fahrenheit, but the boiling point of water is 212 degrees. The exact water temperature is immaterial—that it was hot enough to cause serious burns in seconds is sufficient for purposes of this appeal.

[3] Balle alleges that Susie told him that the hot water had not worked for four months and that she had placed 10 work orders to have the water fixed. No evidence supports these allegations, and allegations alone are

records indicate that the water was broken on November 27, 2018, and was fixed the same day. Second, emails indicate that the hot water heater was repaired on December 26, 2018, so we can infer that it broke sometime before that. Third, the hot water was broken on the day of Balle's injury, January 2, 2019. The fact that the record contains evidence of the hot water not working only these three times does not mean it did not fail on other occasions. David testified that a hot water failure "would be serious enough that it would not necessarily be the subject of a work order." Instead, David would likely have received a phone call about the issue. And Balle does not have firsthand knowledge about the frequency of water malfunctions because he began working in the kitchen just a few days before his injury.

The kitchen had problems beyond the lack of hot water. The kitchen floor was installed over the footing of an older building. When the footing moved, it caused the kitchen floor to buckle, damaging the tile flooring. Retiling the floor did not help; to fix the problem, Pontiac would have had to remove the footing and reinstall the floor. David testified that at the time of Balle's injury, the prison was in the process of major renovations that would address the kitchen floor's structural problems, but David had no control over the timeline of that project.

The parties dispute the nature and extent of the damage to the floor, but for purposes of this appeal, we take Balle's

---

insufficient to create a factual dispute for summary judgment purposes. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 934 (7th Cir. 2021). We consider these allegations only with respect to Balle's claim against Susie, which the district court dismissed at the pleading stage.

version as true. He testified that the tiles were "all broken up," with cracks and holes as deep as four or five inches. The condition of the floor required inmates to be careful because it was "easy to step into … the holes," and "the floor [was] slippery most of the time." Both Daniel and David admit they knew about the condition of the kitchen floor.

### 3. The Water-Carrying Practice

There is no dispute that prison kitchen staff required inmates to heat and carry water in five-gallon buckets when the kitchen's hot water was not working. Balle observed this practice while he worked in the dining room. Daniel Hobart, the head of the kitchen's dietary unit, testified that he "was aware that the inmates would temporarily heat water in large steam kettles and transport it to the … sink" to wash dishes after meals. This practice was longstanding, but although Daniel inspected the kitchen periodically, he testified that he did not know "how or when this practice began." Further, Daniel testified that he did not "specifically recall" the hot water situation on January 2, 2019, and he never saw inmates carrying water. For his part, David denied knowledge of the water-carrying practice altogether. Balle produced no evidence to contradict these points.

We can infer that supervisors did not instruct inmates about how to heat and carry water safely. Daniel testified that the water needed to be heated to 110 degrees Fahrenheit to wash the dishes and that he was unaware that the water was hotter than that. Further, he stated that inmates "could have" used kitchen thermometers to ensure the water stayed at safe temperatures. But although Daniel's responsibilities as head of the dietary unit included "direct[ing] staff in the proper use of facility equipment," he neither personally trained inmates

to maintain safe water temperatures nor instructed kitchen supervisors to do so. Balle's testimony corroborates this account. He testified that he received no safety instruction and that "to the best of [his] knowledge and personal observation," no one ever used a thermometer to check the water temperature. In fact, to his knowledge, "no one ever followed any protocol or safety procedures" when transporting water from the kettles to the sink. But Balle's firsthand knowledge about the kitchen conditions is limited to January 2, 2019, the only time the water failed after he began working in the kitchen.[4]

### B. Complaint and Screening

After exhausting his administrative remedies, Balle initiated this lawsuit in June 2019. He filed a pro se complaint pursuant to 42 U.S.C. § 1983 against six prison officials, although only five are relevant to this appeal: (1) Teri Kennedy, the warden; (2) David Kennedy, the chief engineer; (3) Daniel Hobart, the dietary manager; (4) Susie Hobart, the kitchen supervisor; and (5) a man identified as Mr. Harbarger, who oversaw food supervisors. Balle alleged that these defendants were deliberately indifferent to the dangerous kitchen conditions in violation of the Eighth Amendment.[5]

---

[4] According to Balle, other inmates said that the practice had existed for years, but no testimony or affidavit from these inmates appears in the record. Balle's account of these inmates' statements is inadmissible hearsay, which he cannot use to establish a dispute of fact at summary judgment. *Eaton v. J.H. Findorff & Son, Inc.*, 1 F.4th 508, 512 n.3 (7th Cir. 2021).

[5] Balle also brought a claim based on the failure to adequately supply the kitchen first aid kit against an unknown healthcare employee. The district court dismissed that claim at the screening stage, and Balle does not appeal that dismissal.

In October 2019, the district court screened the complaint under 28 U.S.C. § 1915A and held that Balle could proceed on his claims against David and Daniel only. The court dismissed the claims against Susie and Harbarger because it concluded Balle had not alleged that they "had the authority or expertise to fix the sink, or otherwise indicate what action they could have taken" to fix the sink. It determined that Balle did not state a claim against Teri because he had not alleged that she had personal knowledge about the kitchen conditions, and there is no vicarious liability under § 1983. The court did not specify whether it was dismissing Balle's claims with or without prejudice, and it did not offer Balle an opportunity to amend his complaint.

### C. Motions to Recruit Counsel

At the same time Balle filed his complaint, he moved the district court to recruit counsel pursuant to 28 U.S.C. § 1915(e). Balle stated that he had sent letters requesting pro bono representation to five lawyers, that he had received only rejections, and that his case was too complex for him to litigate without the assistance of counsel. The district court found that Balle had not made a good faith effort to recruit counsel on his own. It denied the motion on that basis without considering the complexity of the case or Balle's competence to litigate it pro se. The court stated that if he renewed his motion, Balle needed "to provide copies of the letters sent to, and received from, prospective counsel."

Balle renewed his motion to recruit counsel two weeks before discovery opened. He did not indicate that he had sent additional letters. Instead, he "respectfully remind[ed] the Court that … he [had] submitted several letters to lawyers asking for representation," had "only received denials or no

responses at all," and had "received one more response from an attorney and two legal letters (unopened) as 'Return to Sender.'" He devoted the balance of the motion to the complexity of his case and his inability to litigate it on his own. Balle did not include copies of the letters he sent, but his motion included scanned images of two envelopes that had been returned as undeliverable and a response from one lawyer declining to represent Balle.

The district court denied Balle's motion, again finding that he "had not demonstrated a good faith effort to obtain counsel on his own." Despite being "advised that if he wished to renew his motion, he was to provide copies of the letters sent to, and received from, prospective counsel," Balle merely asserted "that he sent several letters to attorneys which were returned as undeliverable," which the court thought was because Balle had misdirected the letters. It added that Balle's complaint was not too complex for him to litigate himself.

After the close of discovery, Balle moved the district court to recruit counsel a third time. He added no new information regarding his efforts to secure pro bono representation; he simply reiterated that he had sent letters to five lawyers and had not received any positive responses. The district court noted that Balle "still [did] not provide documentation of his attempts to contact prospective counsel" and denied the motion "for the reasons previously given."

### D. Summary Judgment

In February 2021, Daniel and David moved for summary judgment, arguing that Balle could not establish that they were deliberately indifferent. The district court granted the defendants' motion in July 2021. It found that there was no

genuine dispute of material fact with respect to either defendant's knowledge. As to David, the court found that his uncontroverted testimony established that he was unaware that the kitchen lacked hot water on January 2, 2019, or that inmates were required to carry buckets of hot water to the sink. As a result, no reasonable jury could find that David was deliberately indifferent to the dangerous kitchen conditions. Similarly, the court found that Balle lacked admissible evidence showing a dispute as to Daniel's state of mind. Although Daniel knew about the floor conditions and that inmates sometimes had to carry water in buckets, the court found that no admissible evidence contradicted Daniel's testimony that he was unaware that the water exceeded 110 degrees Fahrenheit.

Balle appealed, and we appointed counsel for him.[6] He raises three sets of arguments: (1) The district court erred by granting summary judgment in favor of Daniel and David; (2) the district court erred by dismissing his claim against Susie and abused its discretion by not giving him leave to replead his claims against Teri and Harbarger; (3) and the district court abused its discretion by not recruiting counsel for him.[7]

---

[6] We thank Steffen Johnson, Ava Mehta, and Conor Tucker of Wilson Sonsini Goodrich & Rosati for their service to their client and this court.

[7] While pro se, Balle appealed the denial of his claim for an injunction requiring Pontiac to repair the kitchen and his claims for damages against the defendants in their official capacities. His counsel agrees that the former claim is moot because Balle is no longer at Pontiac, *Gill v. Linnabary*, 63 F.4th 609, 613 (7th Cir. 2023), and the latter claims are not cognizable in a § 1983 action. *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989).

## II. Eighth Amendment Framework

The Eighth Amendment's prohibition against cruel and unusual punishment requires prison officials to "provide humane conditions of confinement, … ensure that inmates receive adequate food, clothing, shelter, and medical care, and … 'take reasonable measures to guarantee the safety of inmates.'" *Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994) (citations omitted) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)). An official violates the Eighth Amendment if he exhibits "'deliberate indifference' to a substantial risk of serious harm to an inmate." *Id.* at 828 (citations omitted).

The deliberate indifference standard contains "both an objective and subjective component." *Thomas v. Blackard*, 2 F.4th 716, 719 (7th Cir. 2021) (quoting *Daugherty v. Page*, 906 F.3d 606, 611 (7th Cir. 2018)). Objectively, the challenged prison conditions must have been so serious that they "creat[ed] an excessive risk to the inmate's health and safety." *Id.* at 719–20 (quoting *Isby v. Brown*, 856 F.3d 508, 521 (7th Cir. 2017)). The official must also have been "subjectively aware of" the conditions and "intentionally disregarded" them. *Johnson v. Prentice*, 29 F.4th 895, 904 (7th Cir. 2022) (citation omitted).

"Deliberate indifference occupies a space slightly below intent and poses a 'high hurdle and an exacting standard' requiring 'something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Stockton v. Milwaukee County*, 44 F.4th 605, 615 (7th Cir. 2022) (quoting *Donald v. Wexford Health Sources, Inc.*, 982 F.3d 451, 458 (7th Cir. 2020)). While a plaintiff must prove the defendant's subjective state of mind, he need not rely on direct evidence to do so:

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

*Farmer*, 511 U.S. at 842 (citations omitted); *see, e.g.*, *Gevas v. McLaughlin*, 798 F.3d 475, 480 (7th Cir. 2015). But establishing an Eighth Amendment violation based on the obviousness of a risk to inmates requires significant evidence. *See, e.g.*, *Sinn v. Lemmon*, 911 F.3d 412, 422–24 (7th Cir. 2018) (holding that the plaintiff's "limited evidence" was insufficient to establish "a history or pattern of violence … such that a jury could infer a level of gang violence so pervasive that [the defendants] actually knew of a substantial risk of harm to inmates"); *Est. of Simpson v. Gorbett*, 863 F.3d 740, 746–47 (7th Cir. 2017) (holding that evidence that officials assigned an obese detainee to a too-small upper bunk could not support an inference of subjective knowledge of a serious risk to inmates because the danger of falling was not obvious).

Moreover, evidence that the danger was obvious is not enough; there must also be evidence that the defendant was actually "exposed to information concerning the risk" before a jury can conclude that he "must have known about it." *Farmer*, 511 U.S. at 842–43 (internal quotation marks omitted). In *Balsewicz v. Pawlyk*, for example, we noted that to find a prison official liable under the Eighth Amendment, that "official must have been 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and he must have 'drawn that inference.'" 963 F.3d 650, 655

(7th Cir. 2020) (internal alterations omitted) (quoting *Farmer*, 511 U.S. at 837). Thus, "if an inmate provides evidence that the risk of serious harm" from those facts "was obvious, a factfinder could reasonably infer that the official knew of the risk." *Id.* (citing *Farmer*, 511 U.S. at 842).

### III. Summary Judgment:
### Daniel Hobart and David Kennedy

Balle first appeals the grant of summary judgment on his claims against Daniel and David.[8] A party is entitled to summary judgment if there is no genuine dispute of material fact and that party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). We review the grant of summary judgment de novo, construing the facts and drawing all reasonable inferences in favor of the nonmovant. *Xiong*, 62 F.4th at 353–54. Because Balle was pro se at the summary judgment stage, we construe his filings liberally, *Smallwood v. Williams*, 59 F.4th 306, 318 (7th Cir. 2023), but pro se litigants are subject to the same substantive legal rules as represented parties. *See, e.g.*, *Famous v. Fuchs*, 38 F.4th 625, 631 n.22 (7th Cir. 2022).

We hold that the record lacks sufficient evidence to create a genuine dispute as to Daniel's or David's subjective knowledge. Viewing the record in the light most favorable to Balle, a reasonable jury could conclude that the kitchen conditions represented an objectively serious danger to inmates, but gaps in the record prevent a jury from inferring that

---

[8] Daniel and David attempt to invoke qualified immunity, but because they did not assert this defense at summary judgment in the district court, they cannot raise it on appeal of the grant of summary judgment. *Henry v. Hulett*, 969 F.3d 769, 785–86 (7th Cir. 2020) (en banc).

Daniel or David actually knew about the conditions that made the kitchen seriously dangerous.

### A. Objective Risk

We begin with the question of whether the conditions of the kitchen objectively presented a substantial risk of serious harm to inmates. *See Farmer*, 511 U.S. at 828–29; *Thomas*, 2 F.4th at 719–20.[9] It is well established that "slippery surfaces and shower floors in prisons, without more, cannot constitute a hazardous condition of confinement." *Pyles v. Fahim*, 771 F.3d 403, 410 & n.25 (7th Cir. 2014). If the kitchen conditions were only as dangerous as a slippery shower floor, then there could be no Eighth Amendment violation. *Id.*

Exposing inmates to a greater danger than a slip and fall, however, may violate the Eighth Amendment. In *Anderson v. Morrison*, we allowed a claim to proceed past the pleading stage when the plaintiff alleged that, while his hands were cuffed behind his back, officers "ordered him to walk down a set of stairs … covered with food, milk, and other garbage." 835 F.3d 681, 682 (7th Cir. 2016) (internal alteration and quotation marks omitted). These conditions presented a more serious danger than a typical slip-and-fall case because the debris on the stairs created "an obstacle course" and cuffing the

---

[9] Balle argues that the defendants have waived or forfeited this issue on appeal by failing to raise it in their summary judgment briefing in the district court. *See Bradley v. Village of University Park*, 59 F.4th 887, 897–98 (7th Cir. 2023) (discussing when appellees can waive arguments); *Henry*, 969 F.3d at 786 (discussing the distinction between waiver and forfeiture). The defendants may have forfeited this issue, but it is necessary for us to address it. What conditions constituted an objective risk of serious harm informs our analysis of whether a jury could find that the defendants were deliberately indifferent to those conditions.

plaintiff "prevented [him] from steadying himself to avoid tripping, slipping, or tumbling down the flight of stairs." *Id.* at 682–83. By failing to help the plaintiff down the stairs, the guards exposed him to the risk of "plummeting down a flight of 13 steps," a "far greater" danger than "slipping on a shower floor." *Id.* at 683.

Based on the evidence here, the poor condition of the floor alone is not enough to support an Eighth Amendment claim,[10] but carrying near-boiling water over that floor might be. A wet, uneven kitchen floor is not meaningfully more dangerous than the surfaces in the mine run of slip-and-fall cases, but carrying scalding water in a bucket over that floor increases the danger significantly. Crediting Balle's testimony, a reasonable jury could find that the kitchen floor was like an "obstacle course" and that having his hands full with a bucket prevented Balle from seeing the floor beneath him or "steadying himself to avoid tripping." *See id.* Further, falling under these conditions would be more dangerous than slipping in the shower—Balle was carrying gallons of scalding water that could spill on him if he tripped. *See id.* These conditions are objectively dangerous enough to raise an issue of fact and give rise to a potential Eighth Amendment claim.

## B. Subjective Knowledge

Bearing in mind the specific conditions that made the kitchen unreasonably dangerous—carrying scalding water in buckets across the treacherous kitchen floor—we conclude that the record lacks sufficient evidence to allow a reasonable

---

[10] It is possible that a floor in worse condition—with larger holes, for example—could pose an objectively serious risk of harm on its own.

jury to infer that either defendant actually knew about those conditions. That gap in the record dooms Balle's claims because to establish deliberate indifference he must prove the defendants "w[ere] subjectively aware of and intentionally disregarded [the] objectively serious risk to his health or safety." *Johnson*, 29 F.4th at 904 (citation omitted).

### 1. Daniel Hobart

We start with Daniel's subjective knowledge. It is undisputed that Daniel knew that inmates heated and carried water for dishwashing when the kitchen lacked hot water, but the fact that the water was dangerously hot is what distinguishes this case from an ordinary slip-and-fall case. The key issue is whether Daniel knew the water inmates carried was dangerously hot. Balle acknowledges there is no direct evidence of Daniel's knowledge, but he argues that a reasonable jury could infer Daniel knew about the water temperature because the danger was obvious. *See Farmer*, 511 U.S. at 842–43. But although the risk of carrying scalding water over the kitchen floor was obvious, there is insufficient evidence in the record to allow a jury to conclude that Daniel must have known about the danger. *See id.*

The obviousness of a risk may permit an inference of subjective knowledge, but a defendant must have been "exposed to information concerning the risk" in order for a jury to draw that inference. *Id.*; *see Balsewicz*, 963 F.3d at 655. At summary judgment, after drawing all reasonable inferences in favor of the nonmovant, the evidence must allow a jury to conclude that the defendant must have—not might have or should have—been aware of the conditions giving rise to the objectively serious risk to inmates. *See Farmer*, 511 U.S. at 842–43 (suggesting that such an inference is proper when the danger

is "longstanding, pervasive, well-documented, or expressly noted"). For example, in *Haywood v. Hathaway*, we reversed a grant of summary judgment because the record contained evidence that the warden knew that the plaintiff's cell window did not close and that an ice storm caused the prison to lose power during extremely cold weather. 842 F.3d 1026, 1031 (7th Cir. 2016) (per curiam). In contrast, in *Sinn v. Lemmon*, we affirmed summary judgment for two supervisor defendants because the plaintiff's evidence at most showed "isolated incidents" of gang violence, not "widespread unconstitutional practices" from which a jury could infer the defendants had subjective knowledge of a serious risk. 911 F.3d at 422–24.

Here, the evidence is insufficient to support the inference that Daniel must have known that inmates carried dangerously hot water, which in turn means that a reasonable jury could not infer that he had subjective knowledge about the objectively serious risk to Balle. *See Farmer*, 511 U.S. at 842–43. A jury could find that Daniel might or should have been aware of the danger, but these findings are insufficient to establish Eighth Amendment liability. *See Est. of Simpson*, 863 F.3d at 746–47 ("The rule is that an official who should have, but failed, to perceive a significant risk cannot be held liable." (citing *Farmer*, 511 U.S. at 838)).

Even if a jury could infer that Daniel witnessed inmates carrying water, there is no evidence in the record about how often the water was too hot or whether it would be visually obvious to an observer. Balle testified that the water was simmering on January 2, 2019, so perhaps inmates heated water similarly on other occasions, but the record does not support the finding that water was always visibly simmering in the kettles. From these facts, a jury could reasonably infer that

Daniel *might have* seen inmates heating and carrying danger-
ously hot water during one of his visits to the kitchen, but
finding that he *must have* done so would be a speculative in-
ference, not a reasonable one. *See Moran v. Calumet City*, 54
F.4th 483, 491 (7th Cir. 2022).[11]

Alternatively, a jury could infer that Daniel had subjective
knowledge about a substantial risk to inmates if the practice
of heating water in kettles itself was obviously dangerous. *See
Farmer*, 511 U.S. at 842–43. Put differently, does his knowledge
that inmates heated water in kettles alone permit a reasonable
inference that Daniel knew the water would become too hot,
without evidence that he knew about the actual water tem-
perature? On this record, for a jury to infer knowledge of ob-
viously dangerous conditions based on the water-carrying
practice alone, it would first be necessary to draw three dis-
tinct inferences: (1) left to their own devices, inmates would
heat water to dangerous temperatures; (2) supervisors did not
train inmates to use thermometers or otherwise keep the wa-
ter at safe temperatures; and (3) supervisors would fail to
monitor inmates while they heated water and fail to intervene
if the water became too hot. Without all three inferences, the

---

[11] The fact that Balle saw inmates carrying water in the kitchen while
he was working in the dining room does not change things. If Hobart had
been in the dining room at the right time, he too might have seen inmates
carrying buckets. But he already knew that inmates sometimes carried wa-
ter; it is the temperature of the water that matters. Balle did not testify—
and it would be unreasonable to infer—that he could determine the tem-
perature of water in a bucket from a different room. The possibility that
Hobart was present in the dining room while inmates were moving water
in the kitchen does not support an inference that he knew about the water
temperature.

chances of serious injury would go down, either because the water would not become dangerously hot or because inmates would not carry the water until it cooled, and the kitchen conditions would no longer constitute an objective risk of serious harm. *See Est. of Simpson*, 863 F.3d at 746–47 (rejecting an Eighth Amendment claim when there was insufficient evidence of a risk of serious injury); *Pyles*, 771 F.3d at 410 & n.25 (rejecting an Eighth Amendment claim based on the risk of an ordinary slip and fall).

The problem for Balle is that the only evidence about the water-carrying practice is Balle's testimony about January 2, 2019, and Daniel's testimony that he did not provide—or direct his subordinates to provide—instructions about safe water temperatures. Without evidence about the water temperature on other days or testimony from inmates or supervisors about safety training or the lack thereof, all a jury could rely on is evidence from a single date and its own intuitions. A jury could reasonably conclude that there was *some chance* that inmates would heat water to dangerous temperatures under these circumstances, but inferring that Daniel *must have* known that the water-heating and -carrying practice posed a substantial danger to inmates would be unreasonably speculative. *See Moran*, 54 F.4th at 491; *Est. of Simpson*, 863 F.3d at 746–47; *cf. Levin v. Miller*, 900 F.3d 856, 863 (7th Cir. 2018) (expressing doubt about the validity of an "intricate chain of inferences rest[ing] on a series of speculative … links").

To succeed on his Eighth Amendment claim, Balle must prove that the danger was so obvious that Daniel must have known about it. *Farmer*, 511 U.S. at 842–43. Based on the facts in the record, a reasonable jury could not find that Daniel had actual knowledge about the dangerous water temperature.

Thus, the district court correctly granted summary judgment on Balle's claim against Daniel.

**2. David Kennedy**

The analysis regarding David's state of mind is more straightforward. David admitted he knew about the condition of the kitchen floor and the periodic hot water failures in the kitchen, but no evidence shows that he was aware that inmates were instructed to carry scalding water over the kitchen floor. And as with Daniel, no matter how obviously dangerous the kitchen conditions were, without evidence that David was aware of those conditions, a reasonable jury could not infer that he was deliberately indifferent to that danger. *See id.* Therefore, the district court properly granted summary judgment on Balle's claim against David.[12]

### IV. Dismissal at the Screening Stage: Susie Hobart, Teri Kennedy, and Harbarger

We next turn to the dismissal of Balle's claims against Susie, Teri, and Harbarger. Under 28 U.S.C. § 1915A(b)(1), the district court screens complaints filed by prisoners against prison officials, dismissing complaints that fail to state a claim upon which relief may be granted. "To survive dismissal, a prisoner plaintiff need only plead sufficient facts to suggest a plausible claim for relief," which is "not an exacting standard." *Shaw v. Kemper*, 52 F.4th 331, 333–34 (7th Cir. 2022) (citations omitted) (quoting *Jaros v. IDOC*, 684 F.3d 667, 672 (7th

---

[12] Because David lacked subjective knowledge, we do not reach the issue of whether his efforts to fix the structural problem with the kitchen floor establish that he "responded reasonably to the risk" as a matter of law. *See Farmer*, 511 U.S. at 842–43.

Cir. 2012)). We review the dismissal for failure to state a claim
de novo, taking the facts alleged in the complaint as true and
construing the complaint liberally in favor of the pro se plain-
tiff. *Dorsey*, 55 F.4th at 1098–99.

## A. Susie Hobart

The district court dismissed the claim against Susie at the
pleading stage, but Balle argues that he stated a plausible
claim against her. We agree. In essence, the facts Balle alleged
in his complaint match up with the version of the summary
judgment evidence most favorable to Balle. Thus, for the rea-
sons discussed above, Balle plausibly alleged that he faced a
substantial risk of serious harm. *See Farmer*, 511 U.S. at 834. As
to subjective knowledge, what distinguishes Balle's claim
against Susie from his claims against Daniel and David is that
Balle alleges that Susie was present in the kitchen on the day
of his injury. Balle did not allege that Susie knew the water
was dangerously hot, but liberally construed, his complaint
pleaded sufficient facts to permit that inference. The danger
of carrying five-gallon buckets full of scalding water across a
wet, uneven floor is obvious, and a factfinder could infer that
because Susie was present while inmates were carrying water
in this manner, she must have been aware of the danger. *See
id.* at 842–43. From there, the factfinder could infer that Susie
was deliberately indifferent because she required the inmates
to continue this dangerous practice. *Id.*

The district court faulted Balle for failing to "assert[] that
[Susie] had the authority or expertise to fix the sink, or other-
wise indicate what action [she] could have taken." But Balle
only had to plead facts "suggest[ing] a plausible claim for re-
lief," *Shaw*, 52 F.4th at 333–34; he did not need to identify spe-
cific measures Susie should have taken to protect him from

the dangerous kitchen conditions. *Cf. Balsewicz*, 963 F.3d at 655 (analyzing whether the defendant took reasonable measures separately from the elements of the plaintiff's claim). Given Balle's allegations, it is plausible that Susie could have made the kitchen conditions safer, even if she could not have fixed the hot water herself. She could have, for example, ensured the water was kept at a safe temperature; instructed the inmates not to fill the buckets completely, so they would be easier to handle; or sought to provide the inmates with safer equipment, such as carts to place the buckets in. Particularly given that courts construe pro se filings liberally, *Dorsey*, 55 F.4th at 1098–99, Balle did not have to allege actions Susie could have taken to survive the pleading stage.

Susie argues that Balle pleaded himself out of court by alleging that she had submitted work orders about the hot water and that she said she would reverse Balle's job transfer. In Susie's view, these allegations establish that she took "reasonable measures … to avert [a] known risk[]," which "insulate[s] [her] from Eighth Amendment liability." *Bagola v. Kindt*, 131 F.3d 632, 646 (7th Cir. 1997) (citations omitted); *see Farmer*, 511 U.S. at 832–33. But the defendant's actions must be an attempt to lessen the risk in order to constitute reasonable measures. *Balsewicz*, 963 F.3d at 655; *see, e.g., Hale v. Tallapoosa County*, 50 F.3d 1579, 1583–84 (11th Cir. 1995) (noting several possible measures to abate the risk of inmate-on-inmate violence and holding that the defendant's opinion that "work[ing] toward construction of a new jail … was the only way to reduce the risk of violence" did not constitute "reasonable measures" as a matter of law). Placing work orders and offering to transfer Balle back to his old job did not address the danger posed by carrying scalding water over a slippery, potholed floor. Susie may argue that these actions show she was not deliberately

indifferent, but that is a determination for a factfinder to make, not a basis for dismissing a claim at the pleading stage. *See Anderson*, 835 F.3d at 683; *Hale*, 50 F.3d at 1583–84.

Because the complaint stated a plausible Eighth Amendment claim against Susie, the district court erred when it dismissed Balle's claim against her.

## B. Teri Kennedy and Harbarger

The district court also dismissed Balle's claims against Teri and Harbarger. Balle does not argue that his complaint stated a plausible claim against these defendants. Instead, he argues that the district court abused its discretion by failing to give him permission to replead his claims against these defendants. We disagree.

The district court did not specify whether the dismissal of Balle's claims was with or without prejudice, so we treat it as a dismissal with prejudice. *Arnett v. Webster*, 658 F.3d 742, 756 (7th Cir. 2011) ("[A]n involuntary dismissal operates as an adjudication on the merits if not otherwise indicated." (citing Fed. R. Civ. P. 41(b)). Balle accurately points out that "[t]he law is clear that a court should deny leave to amend only if it is certain that amendment would be futile or otherwise unwarranted." *Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022) (citations omitted).[13] Although the district court should have allowed Balle to amend his complaint, *id.*, we review the failure to grant leave to amend only for abuse of discretion. *See White v. Ill. State Police*, 15 F.4th 801, 808 (7th Cir. 2021).

---

[13] Here, the district court did not indicate that any circumstances warranting an "exception[al]" dismissal with prejudice were present. *See Zimmerman*, 25 F.4th at 494 (citations omitted).

Balle did not seek to amend his complaint, and we have held that failing to inform a plaintiff that he can amend his complaint is not an abuse of discretion, even when the plaintiff is pro se. *Arnett*, 658 F.3d at 756 ("[The pro se plaintiff] never sought to amend his complaint … and the district court was not required to inform him that he *should*."); *see also White*, 15 F.4th at 808 (same for a represented party). It is sound practice to make clear if a plaintiff—particularly a pro se plaintiff—may amend his complaint, but the district court did not abuse its discretion by failing to do so here. *Arnett*, 658 F.3d at 756. We affirm the dismissal of Balle's claims against Teri and Harbarger.

### V. Motions to Recruit Counsel

Last, we consider whether the district court was required to recruit an attorney to represent Balle. An indigent prisoner is not entitled to an attorney in civil litigation, but a district court may request that a lawyer represent him under 28 U.S.C. § 1951(e)(1). To determine whether to recruit counsel, the court first asks whether "the indigent plaintiff [has] made a reasonable attempt to obtain counsel or been effectively precluded from doing so," and if so, whether "given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Pruitt v. Mote*, 503 F.3d 647, 654–55 (7th Cir. 2007) (en banc) (citation omitted); *see also Watts v. Kidman*, 42 F.4th 775, 761 (7th Cir. 2022) (holding that the district court may consider the strength or weakness of the plaintiff's case at *Pruitt* step two). We review the denial of a motion to recruit counsel for abuse of discretion, asking whether the district court made a reasonable decision based on the record before it. *Dorsey*, 55 F.4th at 1105. If we find that the district court

abused its discretion, we will reverse only if the denial of the motion prejudiced the plaintiff. *Id.*

Balle focuses on *Pruitt*'s second step, arguing that the district court abused its discretion by finding that Balle was competent to represent himself. But the court denied Balle's motions based on *Pruitt* step one, not two. Determining whether a plaintiff has made reasonable efforts to recruit counsel himself "is a mandatory, threshold inquiry that must be determined before moving to the second inquiry." *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (citations omitted). On the first *Pruitt* step, Balle simply asserts that his efforts to find counsel were reasonable and that the district court abused its discretion by concluding otherwise. We cannot agree.

The district court deemed Balle's assertion that he had contacted five lawyers insufficient to show a reasonable attempt to recruit counsel under *Pruitt* step one. It instructed him to provide more information about his attempts to recruit counsel. The court here may have held Balle to a higher standard than some other district courts, *see, e.g.*, *Scott v. Richter*, 754 F. App'x 458, 461 (7th Cir. 2019) (per curiam) ("No one has disputed that [the plaintiff] met the first requirement by showing that he contacted five attorneys who would not take the case."), but this does not suggest the court abused its discretion. The court wanted to assess the substance of Balle's requests for pro bono representation before determining whether he had made reasonable efforts. It was within its discretion to do so. *See Thomas v. Wardell*, 951 F.3d 854, 858, 860 (7th Cir. 2020) (concluding that the district court "satisfactorily evaluated" requests for counsel when it concluded that writing to 14 lawyers did not constitute reasonable efforts because the "letters did not provide information about the

claims … and some pre-dated events in [the plaintiff's] com-plaint").

A district court might abuse its discretion if it requires too much formality from a plaintiff. *Pruitt* step one requires rea-sonable efforts, not perfect recordkeeping. 503 F.3d at 654–55. Prisoners may face financial or logistical difficulties in making and retaining copies of correspondence, and they may not ap-preciate the importance of saving copies of letters. If a pris-oner lacks a letter that a district court asks for a copy of, he still may be able to substantially comply with the court's re-quest. He might, for example, describe the contents of the let-ter or provide a copy of a letter created later and explain that it is similar to the earlier one.

Here, though, we have no occasion to decide the precise limits of what a district court may require from a plaintiff at *Pruitt* step one because Balle made no attempt to comply with the district court's instructions. The court made clear what it expected of Balle. In its denial of his first motion, the court stated in plain terms that he must provide copies of the letters he sent to lawyers and the responses he received. In response, Balle attached scanned images of two returned envelopes[14] and a denial letter to his second motion, but those documents did not reveal anything about the substance of his requests for

---

[14] We do not know whether these envelopes contained the letters when Balle submitted them, but the record on appeal includes scans of the outsides of the envelopes only, and there is no indication that the district court had access to the letters. If Balle still has access to these letters and wishes to attach them to a future motion, he should remove them from the envelopes to ensure the letters themselves appear in the record.

counsel. Balle did not include copies of the letters he sent seeking pro bono representation, attempt to describe the contents of the letters, or inform the court that he no longer had copies of them. When the court denied his second motion, it found that he "still had yet to demonstrate that he attempted to secure counsel on his own." Balle's third motion included no new information about his efforts to recruit counsel. Thus, Balle failed to provide the district court with the information it deemed necessary to evaluate the reasonableness of his efforts to recruit counsel. The district court did not abuse its discretion by denying Balle's motions. *See Thomas*, 951 F.3d at 858, 860.

We affirm the denial of Balle's motions to recruit counsel, but we note that Balle may renew his request for counsel as he litigates his claim against Susie in the district court. If he does, we emphasize that he must follow the court's instructions about how to demonstrate a good faith effort to obtain counsel or explain in detail why he cannot do so.

### VI. Conclusion

We reverse the dismissal of Balle's claim for damages against Susie Hobart in her individual capacity, modify the judgment on Balle's claims for injunctive relief to a dismissal without prejudice for lack of subject-matter jurisdiction, and affirm the judgment in all other respects. We remand the case for further proceedings on Balle's claim for damages against Susie Hobart in her individual capacity. On remand, Balle may renew his motion to recruit counsel if he wishes.